FITZGERALD KNAIER LLP
Kenneth M. Fitzgerald, Esq. (SBN: 142505)
kfitzgerald@fitzgeraldknaier.com
Robert G Knaier, Esq. (SBN: 234466)
rknaier@fitzgeraldknaier.com
Howard C. Wu, Esq. (SBN: 274039)
hwu@fitzgeraldknaier.com
550 West "C" Street, Suite 2000
San Diego, California 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

Attorneys for Plaintiff Jason Toranto

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

**Jason Toranto,** *an individual*,

Plaintiff,

v.

**Daniel Jaffurs,** *an individual*; **Amanda Gosman,** *an individual*; **The Regents of the University of California,** *a California corporation*; **Rady Children's Hospital-San Diego,** *a California corporation*; **Rady Children's Hospital and Health Center,** *a California corporation*; **Rady Children's Health Services-San Diego,** *a California corporation*; **Rady Children's Hospital Foundation-San Diego**, *a California corporation*; **Rady Children's Medical Staff**, *an unincorporated association*; **Children's Hospital of Orange County,** *a California corporation*; **CHOC Medical Group,** *a California corporation*; and **CHOC Medical Staff**, *an unincorporated association*

Defendants.

Case No.: **'16CV1709 JAH NLS**

**Complaint for:**

1. Conspiracy in Restraint of Trade
2. Monopoly
3. Bad Faith Professional Review
4. Retaliation (Cal. Bus. & Prof. Code §§ 510-512, 2056)
5. Retaliation (Cal. Labor Code § 1102.5)
6. Defamation
7. Violation of Labor Code § 1050 et seq.
8. Tortious Interference with Prospective Economic Advantage
9. Unfair Competition

**Jury Trial Demanded**

Plaintiff Jason Toranto MD, for his complaint against defendants, alleges as follows:

**Summary of Case**

1. This action is brought by Dr. Jason Toranto, a highly trained and exceptionally qualified pediatric plastic and craniofacial surgeon, who has suffered and continues to suffer unlawful retaliation from Dr. Daniel Jaffurs, a vindictive and abusive former colleague at the UC Irvine School of Medicine and Children's Hospital of Orange County ("CHOC"). At every step in his career, Dr. Toranto has accumulated awards, accolades, and admiration from supervisors, colleagues, and peers. He met or exceeded all applicable requirements at every hospital with which he has ever been affiliated, including UC Irvine and CHOC. He has never been subject to any disciplinary action at any time, at any hospital, ever.

2. In contrast, Dr. Jaffurs is a volatile personality with a checkered professional record, who has a history of abusive conduct toward others. Among other things, Dr. Jaffurs has engaged in a pattern and practice of routinely maligning and undermining the careers of surgeons he does not like, or whom he considers an economic threat to his pediatric plastic and craniofacial surgery practice in Orange County. Dr. Jaffurs attempted to enlist Dr. Toranto as an accomplice in his anti-competitive efforts to eliminate competing surgeons in the Orange County market—efforts that Dr. Jaffurs referred to in writing as "weeding the garden." Dr. Toranto refused to assist him. Angered by this refusal, and perceiving Dr. Toranto as a new competitive threat, Dr. Jaffurs turned on Dr. Toranto. Dr. Jaffurs did so by making false and defamatory statements about Dr. Toranto to many, including faculty members at UC Irvine and CHOC.

3. Dr. Jaffurs' false and defamatory statements led the CHOC Foundation to deny employment to Dr. Toranto. Boasting of his success in destroying Dr. Toranto's employment opportunity with the CHOC Foundation, Dr. Jaffurs bragged to Dr. Toranto, in writing, that "you will not be hired. This was done at my

request."

4. Then, after Dr. Toranto decided to leave Orange County and relocate to San Diego, Dr. Jaffurs continued on his vendetta by making false and defamatory statements about Dr. Toranto to Rady Children's Hospital, the sole supplier of pediatric craniofacial plastic surgery services in San Diego and Imperial Counties; and to the Rady Foundation, which employs the vast majority of physicians who practice medicine at Rady Children's.

5. Dr. Jaffurs did this illegally and in concert with Dr. Amanda Gosman, the chief of plastic surgery at Rady Children's and a willing co-conspirator. Dr. Gosman was eager to conspire with Dr. Jaffurs because in 2015 she became the sole pediatric craniofacial plastic surgeon at Rady Children's, after the only other pediatric craniofacial plastic surgeon there retired in late 2015. That surgeon, Dr. Steven Cohen (who is not a defendant), was not just Rady Children's only other pediatric craniofacial plastic surgeon; he was also the only surgeon at Rady Children's performing a range of certain highly complex pediatric craniofacial plastic surgery procedures, and Dr. Gosman hoped to perform those surgeries upon Dr. Cohen's retirement. Dr. Toranto is an expert in those highly complex procedures and therefore would be the surgeon to whom those cases would most likely and appropriately go. Consequently, Dr. Gosman viewed Dr. Toranto's arrival as a competitive threat not only to her status as the sole practicing pediatric craniofacial plastic surgeon at Rady Children's, but also to her plans to assume the complex procedures Dr. Cohen had handled.

6. Fully supportive of Dr. Jaffurs' and Dr. Gosman's anti-competitive campaign against Dr. Toranto, Rady Children's Hospital informed Dr. Toranto (in violation of applicable law and Dr. Toranto's rights) that his application for privileges at Rady Children's Hospital would presumptively be denied. Rady Children's made its decision before anybody in the credentialing process at Rady Children's even met with or spoke to Dr. Toranto, and without going through any

meaningful or objective peer review process to assess his qualifications.

7. Dr. Jaffurs and Dr. Gosman also poisoned the well at the Rady Foundation and with members of the Rady Children's Medical Staff, both of which have since conspired with Drs. Jaffurs and Gosman to deny Dr. Toranto procedurally fair consideration of his application for admitting privileges at Rady Children's Hospital.

8. The above described illegal, defamatory, and anti-competitive conduct has harmed patients in the relevant market. In this case, those patients are children, and most acutely, severely disabled babies. The plastic surgery department at Rady Children's Hospital is among the hospital's worst departments for patient wait times, according to the hospital's own publications. As a result, presumptively denying Dr. Toranto privileges not only wrongly deprives children, babies, and their families of physician choice, but also prolongs their waits. Moreover, Dr. Toranto's particular and exceptional skills and techniques as a pediatric craniofacial plastic surgeon potentially could: (i) reduce the post-operative length of a baby's hospital stay for certain highly complex craniofacial procedures by as much as 60% (from an average of 70 days to an average of 28 days, as Dr. Toranto has achieved elsewhere) with a correspondingly dramatic reduction in medical costs (an estimated savings of hundreds of thousands of dollars for each seriously disabled baby and his or her family); and (ii) make available certain complex procedures that are otherwise not available at all to the children of San Diego and Imperial Counties. As a result, the defendants' unlawful actions damage not only Dr. Toranto, but also injure competition to the detriment of seriously disabled infants and children, and the insurers and government sources of funding that pay for their medical care.

**Parties**

9. Plaintiff Jason Toranto, MD ("Dr. Toranto") is an individual residing in San Diego County, California. Dr. Toranto is, and at all times material to this complaint has been, a physician licensed to practice medicine in the State of California. Dr. Toranto is a Board Certified general surgeon, a Board Certified

plastic and reconstructive surgeon, and a fellowship-trained pediatric plastic and craniofacial surgeon.  Dr. Toranto is a member in good standing of the medical staff at Children's Hospital of Orange County, St. Joseph Hospital of Orange, Scripps Memorial Hospital, Scripps Encinitas Hospital, Sharp Memorial Hospital, and Sharp Grossmont Hospital.  Dr. Toranto is currently the Chief of Plastic Surgery at Senta Medical Clinic in San Diego, California.

10.    Defendant Daniel Jaffurs, MD ("Dr. Jaffurs") is an individual who, on information and belief, resides in Orange County, California.  Dr. Jaffurs is a pediatric plastic and craniofacial surgeon at Children's Hospital of Orange County, and at University of California, Irvine School of Medicine.

11.    Defendant Amanda Gosman, MD ("Dr. Gosman") is an individual who, on information and belief, resides in San Diego County, California.  Dr. Gosman is, and at all times material to this complaint has been, a pediatric plastic and craniofacial surgeon at Rady Children's Hospital in San Diego, California.  On information and belief, Dr. Gosman is, and at all times material to this complaint has been, an employee of defendant Rady Children's Hospital Foundation – San Diego.

12.    Defendants Rady Children's Hospital-San Diego; Rady Children's Hospital and Health Center; and Rady Children's Health Services-San Diego (collectively, "Rady" or "Rady Children's" or the "Rady Children's Defendants") are California corporations residing at the same address.  Rady Children's provides facilities for the delivery of medical services in San Diego, California, and grants privileges for the performance of such medical services through the Rady Children's Medical Staff, a separate unincorporated association, composed of physicians and other healthcare providers.

13.    Defendant Rady Children's Hospital Foundation – San Diego (the "Rady Foundation") is a California corporation residing at the same address as the Rady Children's Defendants.  The Rady Foundation is a partner entity closely affiliated with Rady Children's.  The Rady Foundation employs the vast majority of the

physicians who have admitting privileges at Rady Children's Hospital.

14. Defendant Rady Children's Medical Staff is an unincorporated association composed of physicians and other healthcare providers, which provides medical services to Rady Children's Hospital. On information and belief, the vast majority of the members of the Rady Children's Medical Staff are employed by the Rady Foundation, though a small number of physicians are employed at other organizations (such as private clinics) and have admitting privileges at Rady Children's Hospital.

15. Defendant Regents of the University of California ("UCI" or "UCI Medical Center") is a California corporation, which governs the University of California system, including University of California, Irvine, the UCI School of Medicine, UCI Medical Center and UCI Physicians and Surgeons. UCI provides facilities for the delivery of medical services in Orange, California, and grants privileges for the performance of such medical services through its medical staff, composed of physicians and other healthcare providers.

16. Defendants Children's Hospital of Orange County and CHOC Medical Group (collectively, "CHOC") are California corporations. CHOC provides facilities for the delivery of medical services in Orange, California, and grants privileges for the performance of such medical services through a medical staff, a separate unincorporated association, composed of physicians and other healthcare providers.

17. Defendant CHOC Medical Staff is an unincorporated association composed of physicians and other healthcare providers, which provides medical services to CHOC.

**Jurisdiction and Venue**

18. Pursuant to 28 U.S.C. § 1331, the Court has subject-matter jurisdiction over plaintiff's claims under 15 U.S.C. §§ 1-2 (The Sherman Act). The Court also has

jurisdiction under 28 U.S.C. § 1337 for regulation and protection of commerce. This Court has jurisdiction under 28 U.S.C. § 1367 over the pendant state law claims.

19. This Court has personal jurisdiction over defendants, all of whom reside in California, and are thereby subject to the jurisdiction of a court of general jurisdiction in the State of California. Defendants Dr. Gosman, Rady, Rady Foundation, Rady Children's Medical Staff, and UCI (as defendant Regents of the University of California) reside in this judicial district. Defendant Dr. Jaffurs resides in the State of California, and purposely directed defamatory and knowingly false comments about plaintiff to co-defendants in this district. As more particularly set forth below, defendants CHOC and CHOC Medical Staff are liable for Dr. Jaffurs' defamatory and knowingly false comments about plaintiff to co-defendants in this district.

20. Venue in the Southern District of California is proper under 28 U.S.C. § 1391(b) because all of the defendants are residents of the State of California, and because the defendants' actions occurred in California and in this judicial district.

**Trade and Commerce**

21. Defendants' general business activities have at all times relevant to this complaint had a substantial effect on interstate trade and commerce.

22. In connection with the sale, marketing, and billing of medical services, defendants have used and continue to use instrumentalities of interstate commerce, including but not limited to the United States Postal Service and the Internet.

23. Defendants sell, market, and bill medical services to, among others, Medi-Cal, which receives and uses federal monies.

24. Defendants purchase equipment and supplies from pharmaceutical and medical device companies that sell and market their products in interstate commerce.

25. The specialty of pediatric craniofacial plastic surgery is a highly specialized medical practice. As a matter of best outcomes, patient safety, and practical economics, the practice of pediatric craniofacial plastic surgery (and especially

*complex* pediatric craniofacial plastic surgery) is viable only for medical facilities dedicated to pediatric patients, where the practice has access to a continuous flow of pediatric craniofacial surgery patients, and where there exists a concentration of pediatric specialists who can provide all the specialty care necessary before, during, and after the surgery, particularly for the many pediatric craniofacial plastic surgery patients who are severely disabled babies with multiple complicated medical issues.

26.   Only one hospital serving San Diego and Imperial Counties offers the practice environment necessary for pediatric craniofacial plastic surgery—Rady Children's.  Thus, all three major hospital systems in San Diego—Sharp, Scripps, and UC San Diego—refer all pediatric craniofacial plastic surgery candidates to Rady Children's, even though the Sharp and Scripps hospital systems are otherwise the main competitors of Rady and UC San Diego (which are affiliates).

27.   Dr. Gosman is the only practitioner of pediatric craniofacial plastic surgery at Rady Children's, and thus the only practitioner in all of San Diego and Imperial Counties.

28.   The conspiracy among defendants to deny Dr. Toranto admitting privileges at Rady Children's Hospital has denied Dr. Toranto the ability to practice pediatric craniofacial plastic surgery in San Diego and Imperial Counties, in effect denying him entry to the market for his specialized skills, developed over sixteen years of training and practice.

29.   Defendants' actions in denying Dr. Toranto procedurally fair consideration of his application for admitting privileges at Rady Children's have affected interstate commerce to the detriment of child patients, including seriously disabled babies, and their families by (i) reducing physician choice; (ii) increasing wait times; (iii) on information and belief, increasing the length of post-operative hospital stays; (iv) on information and belief, increasing medical costs; (v) affecting payments to and from those who pay for their services (including out-of-state insurers and federally-funded insurance programs); (vi) affecting payments to other interstate entities including

pharmaceutical and medical device companies; and (vii) on information and belief, completely denying the children of San Diego and Imperial Counties access to certain complex pediatric craniofacial plastic surgery procedures that are performed by Dr. Toranto but, on information and belief, not by Dr. Gosman and are therefore currently unavailable at Rady Children's.

**No Immunity Under 42 U.S.C. § 11101 et seq.**

30. The Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11111, 11112(a), provides limited civil immunity for certain persons with respect to "professional review actions" that meet certain criteria. None of the defendants are eligible for HCQIA's limited civil immunity for the reasons stated below.

31. As to all defendants, the illegal activities described in this complaint include illegal activities that occurred before Dr. Toranto's application for privileges at Rady Children's was complete, and therefore before the credentialing process had even begun. Illegal activities that occurred before Dr. Toranto's application for privileges at Rady Children's was complete, and therefore before the credentialing process had even begun, were not and cannot be "professional review actions" under HCQIA. Therefore, defendants are not entitled to the limited civil immunity under HCQIA section 11151 with respect to such illegal activities.

32. As to all defendants, the illegal activities described in this complaint which occurred after Dr. Toranto's application for privileges at Rady Children's was complete were part of an illegal conspiracy which commenced before the credentialing process had even begun. This illegal conspiracy which commenced before the credentialing process had even begun was not and cannot be a "professional review action" under HCQIA. Therefore, defendants are not entitled to the limited civil immunity under HCQIA section 11151 with respect to such conspiracy.

33. In January 2016, Rady Children's informed Dr. Toranto that his application for admitting privileges would presumptively be denied. Whatever "peer review"

Rady Children's claims to have done has been a sham.  Rady Children's made its decision without ever meeting with or talking to Dr. Toranto, and without advising him of any problems with his application.  Rady Children's has also received at least 14 unqualified letters of support for Dr. Toranto's application from physicians, administrators, and staff members.  Four of those letters, from different physicians, were sent to Rady Children's in a supplemental package on March 21, 2016 and specifically addressed Dr. Jaffurs' defamatory statements about Dr. Toranto, accurately describing them as "entirely unacceptable," "clearly false," "completely unprofessional," a "personal vendetta" and "having no basis in fact."  On information and belief, Rady Children's has not contacted any of those four physicians to discuss those letters.  Moreover, Dr. Toranto's application was complete nearly nine months ago, and Rady Children's has yet to grant him a single interview or hearing despite repeated requests.  Rady Children's failure to conduct any kind of meaningful or objective peer review demonstrates that Rady Children's has never been interested in giving Dr. Toranto's application fair consideration.  Therefore, defendants are not entitled to the limited civil immunity of HCQIA, because a sham peer review is not a "professional review action" under HCQIA section 11151.

34.   Rady Children's and Dr. Gosman are not entitled to the limited civil immunity of HCQIA because any action or recommendation made by Rady Children's or Dr. Gosman which may constitute a "professional review action" in connection with the presumptive denial of Dr. Toranto's application for privileges at Rady Children's and the denial of procedurally objective and fair consideration of his application does not satisfy the requirements of the safe harbor.  Specifically, as to each and any such "professional review action":

    a.   It was not taken in the reasonable belief that it was in the furtherance of quality health care.  Rather, it was taken to further anti-competitive and illegal purposes for personal benefit.

b. A reasonable effort to obtain the facts of the matter was not undertaken. Among other things, actions were taken and recommendations were made to presumptively deny privileges to Dr. Toranto without even speaking with him or informing him of any concerns. This is a *per se* violation of the safe harbor, as any reasonable effort to obtain the facts of a matter relating to Dr. Toranto requires, at a minimum, asking him about it.

c. Defendant Rady Children's has not offered Dr. Toranto adequate notice, nor has it afforded any interviews or hearing procedures or any other fair procedures to Dr. Toranto. To date, though Dr. Toranto's application was complete nearly nine months ago, Dr. Toranto has not been granted a single interview or hearing despite repeated requests.

d. Action was not taken in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain the facts. No reasonable effort was made to obtain the facts, so no reasonable belief could be based on them. Rather, Dr. Gosman and Rady Children's have acted in bad faith and for anti-competitive purposes for personal gain without regard for the facts.

35. Accordingly, defendants cannot avail themselves of the protection of the limited civil immunity under HCQIA Section 11111(a)(1).

36. The protection from civil liability provided by HCQIA section 11111(a)(2) to individuals providing information to professional review bodies is not available to Dr. Jaffurs because the information he provided to Rady Children's was false, and he knew such information was false.

**Respondeat Superior/Agency**

37. At all times material to this complaint, Dr. Jaffurs has been an employee of UCI. Dr. Jaffurs' unlawful conduct, as set forth herein, was conducted in his

professional capacity as an employee of UCI. UCI is liable to plaintiff for the unlawful conduct of Dr. Jaffurs, under the theory of *respondeat superior*.

38. At all times material to this complaint, Dr. Jaffurs has been the chief of plastic surgery at CHOC. Dr. Jaffurs' unlawful conduct set forth in this complaint was conducted in his professional capacity as chief of plastic surgery at CHOC. CHOC is liable to plaintiff for the unlawful conduct of Dr. Jaffurs, under the theory of agency.

39. At all times material to this complaint, Dr. Jaffurs has been the chief of plastic surgery of the CHOC Medical Staff. Dr. Jaffurs' unlawful conduct set forth in this complaint was conducted in his professional capacity as chief of plastic surgery of the CHOC Medical Staff. CHOC Medical Staff is liable to plaintiff for the unlawful conduct of Dr. Jaffurs, under the theory of agency.

40. At all times material to this complaint, Dr. Gosman has been an employee of Rady Foundation. Dr. Gosman's unlawful conduct set forth in this complaint was conducted in her professional capacity as an employee of Rady Foundation. Rady Foundation is liable to plaintiff for the unlawful conduct of Dr. Gosman, under the theory of *respondeat superior*.

41. At all times material to this complaint, Dr. Gosman has been the chief of plastic surgery at Rady Children's. Dr. Gosman's unlawful conduct set forth in this complaint was conducted in her professional capacity as chief of plastic surgery at Rady Children's. Rady Children's is liable to plaintiff for the unlawful conduct of Dr. Gosman, under the theory of agency.

42. At all times material to this complaint, Dr. Gosman has been the chief of plastic surgery of the Rady Medical Staff. Dr. Gosman's unlawful conduct set forth in this complaint was conducted in her professional capacity as chief of plastic surgery of the Rady Medical Staff. Rady Medical Staff is liable to plaintiff for the unlawful conduct of Dr. Gosman, under the theory of agency.

43. Plaintiff is informed and believes, and thereon alleges, that at all times material to this complaint, Dr. Gosman, the Rady Defendants, the Rady Foundation, and Rady Children's Medical Staff acted as the agent of each other, and were at all times acting within the course and scope of such agency, with the permission and consent of each other.

44. Plaintiff is informed and believes, and thereon alleges, that at all times material to this complaint, Dr. Jaffurs, UCI, CHOC, and CHOC Medical Staff acted as the agent of each other, and were at all times acting within the course and scope of such agency, with the permission and consent of each other.

**Facts**

45. At every step in his career, Dr. Toranto has accumulated awards, accolades, and admiration from supervisors, colleagues, and peers. He met or exceeded all applicable requirements at every hospital with which he has ever been affiliated, including UCI and CHOC. He has never been subject to any disciplinary action at any time, at any hospital, ever.

46. Recent praise for Dr. Toranto includes the following statements, in writing, from leading physicians and hospital administrators:

a. The CEO of CHOC described Dr. Toranto as having "a unique set of talents" with which he performed highly complex craniofacial surgeries "at a level that was not present at CHOC until he arrived" and that "he elevated the level of surgical expertise at [CHOC] in the realm of craniofacial surgery." She further described Dr. Toranto as "communicat[ing] effectively with hospital administration and [bringing] together disparate members of the medical staff into cohesive teams."

b. A plastic and reconstructive surgeon at UCI described Dr. Toranto as "a consummate professional who unquestionably possesses all of the necessary skills, experience, competence and other attributes necessary

for a surgeon performing complicated pediatric craniofacial cases."

c. A leading pediatric craniofacial plastic surgeon described Dr. Toranto as "a highly qualified and outstanding pediatric plastic and craniofacial surgeon." This surgeon further stated that he has "operated with and observed [Dr. Toranto] extensively on immensely complicated pediatric plastic and craniofacial surgery cases. In fact, some of those cases are of such extraordinary complexity that Dr. Toranto is in an elite group of surgeons in the world who can perform them. Any child would be very lucky to have Dr. Toranto as their surgeon" and "Rady's would be very lucky indeed to have him."

d. A leading surgeon at UCI has written that Dr. Toranto is "superb" and "truly was one of the best Plastic Surgeons [UCI has] ever had," that he is "the true model of able, available and affable" and that he would be "an amazing asset to [Rady]."

e. Another surgeon at UCI has called Dr. Toranto "technically one of the best plastic surgeons [she has ever] worked with," described his results as "exceptional, cosmetically and functionally," and described his bedside manner as being "without reproach."

f. An oral and maxillofacial surgeon who operated with Dr. Toranto has written that Dr. Toranto is "an excellent pediatric plastic and craniofacial plastic surgeon" and that operating with him "was a pleasure not only because of his superior clinical talent but also because of his affable demeanor."

g. The Chair of the Credentials Committee at CHOC describes Dr. Toranto as "an excellent surgeon" who provides "prompt and caring service," who has been "praised by families in regard to his skill and bedside manner," and whose record from a credentialing point of view is "stellar."

h. CHOC's Chief of Neonatology praised Dr. Toranto as a "meticulous" and "excellent surgeon" who "excels as both a team player and program builder."

i. CHOC's Chief of Neurosurgery who is also the head of pediatric neurosurgery at UCI described Dr. Toranto as a "consummate professional" who was "adored by his patients."

j. CHOC's Pediatrician in Chief praised Dr. Toranto for "his surgical talent, his skills in program development and collaboration, and his overall stewardship on behalf of CHOC Children's Hospital," and as "a positive example of how to build teams and programs at a children's hospital."

47. Ironically, the day before Dr. Toranto tendered his resignation to UCI (as more particularly described below), Dr. Toranto was recommended for promotion at UCI. The departmental recommendation described Dr. Toranto as having "established himself as an excellent craniofacial pediatric surgeon… [who] brought a new dimension for orthognathic surgery to [CHOC]." The recommendation further described Dr. Toranto as "an excellent teacher" and complimented his research and service to UCI.

48. Dr. Toranto was recently notified that he will be inducted as a Fellow of the American College of Surgeons in October 2016, which will make him a member of the largest and arguably most prestigious organization of surgeons in the world. As described by the American College of Surgeons, being a Fellow in the College means "that the surgeon's education, training, professional qualifications, surgical competence, and ethical conduct have passed a rigorous evaluation, and have been found to be consistent with the high standards established and demanded by the College."

*1994 to 2013 – Prior to Orange County*

49. Dr. Toranto earned his undergraduate degree from Stanford University in

1999.

50. In 2001, while pursuing his medical degree, Dr. Toranto received the University of Michigan International Institute Award for Latin American and Caribbean Studies, which award funded his work in Buenos Aires, Argentina at Hospital de Clinicas serving the needs of Latin American patients.

51. In 2004, while pursuing his medical degree, Dr. Toranto received a second award – the University of Michigan Global REACH International Studies Award – which funded his work in Buenos Aires, Argentina helping Hispanic children with cancer in Hospital Italiano's pediatric oncology ward.

52. Dr. Toranto graduated in 2004 from the University of Michigan, where he obtained his medical degree.

53. Dr. Toranto completed his general surgery residency in 2009 at the University of Alabama at Birmingham. He is a Board Certified general surgeon.

54. Dr. Toranto travelled to Jamshedpur, India with Operation Smile as a Regan Fellow, where he performed craniofacial plastic surgeries (cleft lip and cleft palate repairs) for indigent patients with no other access to such care.

55. Dr. Toranto completed his plastic surgery residency in 2012 at Duke University.

56. Dr. Toranto completed a craniofacial fellowship in 2013 at the University of Southern California and Children's Hospital of Los Angeles. He is a Board Certified plastic and reconstructive surgeon with a specialty in craniofacial plastic surgery and complex pediatric craniofacial plastic surgery, in particular.

*2013-2015: Orange County*

57. Between October 2013 and October 2015, Dr. Toranto lived and worked in Orange County, California.

58. In 2013, following the completion of his craniofacial fellowship in Los Angeles, Dr. Toranto took a position as an Assistant Professor at UCI and joined the medical staff of UCI Medical Center.

59. In 2013, through UCI's relationship with CHOC, Dr. Toranto joined the medical staff of CHOC, specifically to practice craniofacial and pediatric plastic surgery.

60. At UCI, Dr. Toranto was junior to Dr. Jaffurs, who, like Dr. Toranto, is a pediatric plastic and craniofacial surgeon. While UCI had a number of plastic surgeons on its medical staff, Dr. Toranto and Dr. Jaffurs were the only two surgeons who specialized in pediatric craniofacial plastic surgery.

61. In 2013 when Dr. Toranto joined the medical staff at CHOC, and at all times while Dr. Toranto lived and worked in Orange County, Dr. Jaffurs was the chief of plastic surgery at CHOC, and was therefore administratively over Dr. Toranto.

62. As a professional and a new arrival at UCI and CHOC, Dr. Toranto initially worked hard to cultivate a good working relationship with Dr. Jaffurs.

63. However, soon after Dr. Toranto began at UCI, Dr. Jaffurs asked Dr. Toranto to help attack and discredit another pediatric craniofacial plastic surgeon ("Physician No. 1").

a. On information and belief, some time prior to Dr. Toranto's arrival at UCI and CHOC, Dr. Jaffurs sought to damage the career of Physician No. 1, whom Dr. Jaffurs saw as a competitor.

b. Physician No. 1 is skilled at performing a particularly complex pediatric craniofacial plastic surgery procedure called neonatal mandibular distraction osteogenesis ("MDO"). Neonatal MDO is a procedure involving the installation of a device into a newborn's jaw, which device is used to grow and reshape the jaw. Newborns and infants who are candidates for MDO suffer from clinically important and dangerous airway obstructions. Often this problem is diagnosed at birth, and these babies are taken directly to the Neonatal Intensive Care Unit ("NICU").

c.  On information and belief, as part of Dr. Jaffurs' attack on Physician No. 1, Dr. Jaffurs sought to perform an MDO procedure himself in order to prevent Physician No. 1 from performing it, and to demonstrate a lack of any need for the services of Physician No. 1.

d.  On information and belief, Dr. Jaffurs did not know how to properly place the MDO distraction device, severely injured the baby, and as a result is now prohibited from performing MDOs at CHOC.  This left Physician No. 1 as the only physician at CHOC who could perform MDOs.

e.  Dr. Toranto is an expert in MDOs, and when he joined UCI and CHOC, Dr. Jaffurs saw an opportunity to continue his efforts to discredit and undermine the career of Physician No. 1 by using Dr. Toranto.

f.  Within weeks of Dr. Toranto's arrival at CHOC and while en route to a meeting with a CHOC hospital administrator, Dr. Jaffurs told Dr. Toranto that "this is going to be great," because Dr. Toranto will be able to help him (Dr. Jaffurs) "stick it to [Physician No. 1]."  At that meeting, Dr. Jaffurs assailed Physician No. 1 to the hospital administrator.

g.  Though Dr. Toranto was new to the hospital, and desired a good working relationship with Dr. Jaffurs, Dr. Toranto refused to help Dr. Jaffurs discredit Physician No. 1, for Dr. Toranto perceived no wrongdoing on the part of Physician No. 1, and Dr. Toranto considered Dr. Jaffurs' behavior to be unethical and completely unprofessional.

h.  Dr. Toranto met with the Chief of the NICU at a later date to discuss MDO, and the subject of Physician No. 1 was raised by the Chief of the NICU.  Dr. Toranto stated that he would be pleased to work with

Physician No. 1 and that, in fact, the inclusion of Physician No. 1 in the MDO team would make the team stronger.

i. Some months later, Dr. Jaffurs asked Dr. Toranto to help compile information that he (Dr. Jaffurs) could use to undermine Physician No. 1's ability to care for patients at CHOC.

j. Dr. Toranto refused to collude with Dr. Jaffurs.

64. In a separate incident, Dr. Toranto received a letter from the medical staff office at CHOC regarding medical staff privileges for another pediatric craniofacial plastic surgeon ("Physician No. 2"). The letter stated that concerns had been raised about Physician No. 2, which, if substantiated, would result in the revocation of Physician No. 2's privileges for performing certain pediatric craniofacial plastic surgery procedures at CHOC. The letter asked Dr. Toranto whether he (Dr. Toranto) would substantiate those concerns.

a. Dr. Toranto asked Dr. Jaffurs about the letter, and Dr. Jaffurs admitted that he (Dr. Jaffurs) caused the letter to be issued. Specifically, Dr. Jaffurs informed Dr. Toranto that he (Dr. Jaffurs) had gone to the medical staff office at CHOC to find out how to remove clinical privileges from a division member. He found out that if the chief filled out paperwork and this was authenticated by another surgeon in the division, the surgeon in question would be stripped of his/her privileges. Dr. Jaffurs filled out the paperwork in his role as the chief, which generated the letter that was sent to Dr. Toranto.

b. Dr. Jaffurs instructed Dr. Toranto to sign the letter.

c. Dr. Toranto asked Dr. Jaffurs if he (Dr. Jaffurs) had ever spoken with Physician No. 2 about whatever concerns he (Dr. Jaffurs) had. Dr. Jaffurs said he had not, but again instructed Dr. Toranto to sign the letter.

d. Dr. Toranto refused.

e. Dr. Toranto also informed the chairman of the Department of Plastic Surgery at UCI, Dr. Greg Evans ("Dr. Evans"). Specifically, Dr. Toranto told Dr. Evans that Dr. Jaffurs was attacking Physician No. 2, that Dr. Jaffurs was attempting to coerce Dr. Toranto to aid in those attacks, that Dr. Jaffurs' attacks were unethical and highly unprofessional, that Physician No. 2 was a senior member of the division of plastic surgery at CHOC who had served the children of Orange County for decades, and that Dr. Toranto would not be a party to such attacks.

65. Following these incidents, and after learning about similar incidents in the past, Dr. Toranto came to understand that Dr. Jaffurs has a routine pattern and practice of leveling baseless attacks against surgeons whom Dr. Jaffurs perceives as a competitive threat—Dr. Jaffurs described this pattern in writing as "weeding the garden"—and has a history of devious and confrontational behavior.

a. On information and belief, Dr. Jaffurs was asked to leave Miller Children's Hospital after engaging in similar baseless efforts to discredit a pediatric plastic surgeon there ("Physician No. 3"). Physician No. 3, the target of Dr. Jaffurs' attacks, was the chief of the plastic surgery division at Miller Children's Hospital.

b. On information and belief, Dr. Jaffurs failed his initial oral examination for the American Board of Plastic Surgery because, during the exam, Dr. Jaffurs demonstrated physically confrontational behavior toward his examiner ("Physician No. 4").

66. Once Dr. Toranto made clear that he would not be Dr. Jaffurs' accomplice in prosecuting Dr. Jaffurs' personal vendettas, Dr. Jaffurs developed a deep-seated personal animosity towards Dr. Toranto.

67. Dr. Jaffurs' personal animosity created a hostile and unwelcoming work environment for Dr. Toranto.

a. Dr. Jaffurs' behavior included yelling at Dr. Toranto, and refusing to acknowledge him.

b. Dr. Jaffurs' behavior was witnessed by other physicians, including Dr. Evans, when Dr. Jaffurs yelled at Dr. Toranto during internal meetings.

c. Dr. Jaffurs used his seniority over Dr. Toranto to instruct surgery schedulers to assign to Dr. Toranto patients that Dr. Jaffurs did not want to see. Dr. Jaffurs did this without consulting with Dr. Toranto.

d. Dr. Jaffurs instructed Dr. Toranto to take significant additional call without compensation, and threatened him if he disagreed.

e. In May 2015, Dr. Jaffurs sent an email to several physicians (including Dr. Toranto and Dr. Evans) suggesting that another physician ("Physician No. 5") was allowed to go on sabbatical only because Physician No. 5 is Jewish. In the email, Dr. Jaffurs asked Dr. Toranto to confirm that only Jewish physicians are permitted sabbaticals. Dr. Toranto found Dr. Jaffurs' email to be anti-Semitic, unprofessional and in poor taste. Dr. Toranto, Physician No. 4 and Physician No. 5 are all Jewish. Dr. Jaffurs is not.

68.   No longer willing to suffer the hostile work environment created by Dr. Jaffurs, but not wanting to uproot his practice, Dr. Toranto tendered his resignation with UCI and sought employment with the CHOC Foundation. (Because of the affiliation between UCI and CHOC, it was necessary for Dr. Toranto to resign from UCI before proceeding with the CHOC Foundation to avoid the appearance of "employee poaching" by a CHOC-related entity.) With the CHOC Foundation, Dr. Toranto had the opportunity to continue his practice at CHOC and UCI without being subordinate to Dr. Jaffurs at either UCI or CHOC.

69.   Dr. Toranto tendered his resignation to UCI on July 2, 2015.

70.   Immediately, Dr. Jaffurs commenced an outrageous and vicious campaign against Dr. Toranto in order to injure Dr. Toranto and prevent his employment at

the CHOC Foundation.

a. On information and belief, Dr. Jaffurs made false and defamatory statements to multiple persons, including the CHOC Foundation, about Dr. Toranto both orally and in writing.

b. In the presence of Dr. Toranto, Dr. Jaffurs told several physicians, including the president of the CHOC Foundation, that Dr. Toranto refused to accept Hispanic and low-income patients. Dr. Jaffurs knew these statements were false. (In fact, Dr. Toranto, who speaks fluent Spanish and who received awards supporting his work in Latin American hospitals, caters to the Hispanic community. In addition, Dr. Toranto served a considerably higher percentage of low-income patients than the departmental average at UCI.)

c. Dr. Jaffurs also taunted Dr. Toranto with hostile emails, including job fair emails implying that Dr. Toranto should seek employment elsewhere.

d. Dr. Jaffurs, in violation of medical staff bylaws of CHOC, improperly attempted to prohibit Dr. Toranto from continuing to see patients at CHOC outpatient clinics.

e. Dr. Jaffurs, who previously almost never entered the operating room while Dr. Toranto was performing surgeries, began interrupting his cases, even entering the operating room multiple times during a single procedure—notably when a child's skull was being reconstructed, and during the point in the procedure when the child's skull had been removed and brain was exposed—to harass Dr. Toranto.

71. The CHOC Foundation did not hire Dr. Toranto.

72. Dr. Jaffurs wrote to Dr. Toranto, "I am assuming that by now the Choc (*sic*) Foundation has informed you that you will not be hired. This was done at my request."

*2015-Present: San Diego*

73. In 2015, though Dr. Toranto wanted to remain in Orange County and join the CHOC Foundation for the reasons described above, Dr. Toranto began to contemplate moving to San Diego. First and foremost, Dr. Toranto was considering this move because he could no longer bear working with Dr. Jaffurs, and wanted to avoid a formal dispute or litigation. Second, Dr. Toranto has family in San Diego, and wished to be closer to them.

74. Dr. Toranto began exploring opportunities in San Diego by reaching out to professional contacts in the community. He learned that Rady Children's in San Diego had a need for a surgeon with his particular expertise. Dr. Toranto was informed that Rady Children's had two pediatric craniofacial plastic surgeons—defendant Dr. Gosman and Dr. Steven Cohen (who is not a defendant). Dr. Cohen was about to retire and did retire from performing surgeries at Rady in 2015. Moreover, Dr. Toranto was informed that the Rady Children's plastic surgery department had one of the longest and worst wait times among all of the departments at the hospital, which were expected to increase upon Dr. Cohen's retirement.

75. Dr. Toranto gave notice of his resignation to UCI on July 2, 2015, as aforesaid.

76. Shortly thereafter, Dr. Toranto attempted to contact defendant Dr. Gosman to discuss his interest in potentially relocating to San Diego. Dr. Toranto first tried to contact her by telephone, but he received no reply. Then, Dr. Toranto reached out to Dr. Gosman by email. In response, Dr. Gosman made clear that she did not want any other pediatric craniofacial plastic surgeon on staff at Rady, writing to Dr. Toranto that "we have more than enough craniofacial coverage at Rady/UCSD and are not looking for anyone at this time."

77. Dr. Toranto also reached out to other professional contacts in San Diego, seeking advice about the city and the market for his services. A number of these

physicians referred Dr. Toranto again to Dr. Gosman (perhaps not realizing that Dr. Toranto had independently reached out to Dr. Gosman), and in response, Dr. Gosman reiterated to Dr. Toranto that Rady Children's did not have a place for Dr. Toranto.

78. Dr. Toranto moved to San Diego in October 2015.

79. On information and belief, beginning in July 2015 soon after Dr. Toranto resigned from UCI, and before Dr. Toranto moved to San Diego, Drs. Jaffurs and Gosman made contact, and combined and conspired to prevent Dr. Toranto from obtaining privileges at Rady Children's.

80. In late October 2015, Dr. Toranto submitted his complete application for privileges to Rady Children's.

81. Dr. Gosman improperly shared information contained in Dr. Toranto's confidential application with Dr. Jaffurs, including the names of physicians whom Dr. Toranto had listed as references. Dr. Toranto is informed and believes that Dr. Jaffurs then submitted a letter to Rady Children's that disparaged and attacked those specific physicians (and no others).

82. Dr. Gosman used her influence as the chief of the plastic surgery department at Rady, as an employee of the Rady Foundation, and as a member of the Rady Children's Medical Staff to prevent plaintiff from receiving fair consideration of his application, and to preserve her position as the sole pediatric craniofacial plastic surgeon at Rady Children's.

83. On information and belief, between October 2015 and January 2016 (and possibly thereafter), and in concert and collusion with Dr. Gosman, Dr. Jaffurs made defamatory statements to Rady Children's, with the intent to professionally harm Dr. Toranto, to prevent Dr. Toranto from obtaining employment as a pediatric craniofacial plastic surgeon, and to prevent Dr. Toranto from obtaining privileges at Rady Children's. Dr. Jaffurs outrageously wrote to Rady that Dr. Toranto "should not be allowed to operate on children," meaning that he was so unfit and

incompetent that he could not be trusted to perform in his chosen profession, for which he is unquestionably qualified and had trained and practiced for sixteen years. All of these defamatory statements were untrue, were known by Dr. Jaffurs to be untrue, and were made by Dr. Jaffurs out of hatred, ill-will, spite, malice, and anti-competitive animus.

84. On information and belief, Dr. Jaffurs and Dr. Gosman conspired to spread false information about plaintiff to the members of the Rady Children's Medical Staff, with the intent to prevent plaintiff from obtaining employment as a pediatric craniofacial plastic surgeon and from receiving fair consideration of his application for privileges at Rady Children's.

85. On information and belief, the Rady Foundation has combined and conspired with co-defendants to prevent Dr. Toranto from obtaining privileges at Rady Children's. The Rady Foundation employs the vast majority of physicians who have privileges at Rady Children's, including Dr. Gosman. Because Dr. Toranto is not employed by the Rady Foundation, any revenue Dr. Toranto would generate after gaining privileges at Rady Children's would be diverted from Dr. Gosman, and as a result, from the Rady Foundation. The Rady Foundation is therefore economically motivated to conspire to deny Dr. Toranto procedurally fair consideration of his application for admitting privileges at Rady Children's.

86. On January 6, 2016, Dr. Toranto received a call from Dr. Daniela Carvalho, the chair of Rady Children's department of surgery, who informed Dr. Toranto that his application for privileges at Rady Children's would be presumptively denied. Dr. Carvalho further advised Dr. Toranto that he would be presumptively reported to the California Medical Board if he did not withdraw his application.

87. Dr. Toranto was stunned, not only because he is a highly qualified and eminently credentialed surgeon with a blemish-free professional record, but because to this point, Dr. Toranto had not received a single interview or hearing at Rady, or been given any notice that there was any problem with his application. When Dr.

Toranto asked Dr. Carvalho about the basis for Rady's premature determination, she stated only and vaguely that it was due to concerns over "references."

88. Between the above-referenced call and February 2016, Dr. Toranto requested on two additional occasions that Rady provide him with information as to the basis for its determination and give him an opportunity to be heard. Rady did not grant an interview and stated only vaguely and misleadingly that Rady's concerns were "behavioral."

89. In early February 2016, Dr. Toranto advised Rady that he would not withdraw his application.

90. On March 21, 2016, Dr. Toranto delivered a package of supplemental information to Rady in support of his application. This supplement included background on Dr. Jaffurs' personal animosity towards Dr. Toranto; attached evidence that Dr. Toranto had met or exceeded all performance criteria at CHOC and UCI at all times he was on the active medical staff there; attached his departmental recommendation for promotion from the day before Dr. Toranto tendered his resignation at UCI; and also attached eleven unqualified letters of support from physicians, administrators and staff members at CHOC and UCI, including (i) the CEO of CHOC, (ii) CHOC's Chief of Neonatology and Director of the NICU, (iii) CHOC's Pediatrician-in-Chief, (iv) CHOC's Chief of Neurosurgery, (v) the head of CHOC's Credentialing Committee, (vi) the Director of UCI's Melanoma Center, and (vii) two plastic and reconstructive surgeons at UCI.

91. Four of the letters of support included in that supplement directly addressed the allegations made by Dr. Jaffurs about Dr. Toranto, accurately describing Dr. Jaffurs' allegations as "entirely unacceptable," "clearly false," "completely unprofessional," a "personal vendetta," and "[having] no basis in fact."

92. To date, Dr. Toranto has not received one interview or hearing from Rady Children's, despite repeated requests from Dr. Toranto, despite violations of

applicable law, and despite a section in the Rady Medical Staff Bylaws that requires the "timely and good faith" processing of applications for admitting privileges.

**First Claim for Relief**

**(Conspiracy in Restraint of Trade, 15 U.S.C. § 1)**

**(Against all Defendants)**

93. Dr. Toranto hereby incorporates the paragraphs above, each as though fully set forth herein.

94. Beginning in July 2015 and continuing through the present, Dr. Jaffurs and Dr. Gosman have conspired to prevent Dr. Toranto from obtaining privileges as a pediatric craniofacial plastic surgeon at Rady Children's (and therefore prevent Dr. Toranto from obtaining employment in his specialty in San Diego and Imperial Counties). Dr. Jaffurs has been acting on feelings of personal and anti-competitive animus, while Dr. Gosman has been motivated by her desire to suppress competition in her local market to her professional and economic benefit.

95. On information and belief, the Rady Foundation agreed to support its employee, Dr. Gosman, in her anti-competitive efforts because revenue that Dr. Gosman would otherwise generate for the Rady Foundation would be diverted in significant part if Dr. Toranto (who is not an employee of the Rady Foundation) were granted privileges at Rady Children's and began serving patients who would otherwise have no choice but to see Dr. Gosman.

96. On information and belief, Dr. Gosman has used her influence and power within Rady Children's and Rady Children's Medical Staff to convince Rady Children's and Rady Children's Medical Staff to support her in her anti-competitive efforts. Rady Children's and Rady Children's Medical Staff have in fact supported Dr. Gosman in her anti-competitive efforts by: (i) presumptively denying in January 2016 Dr. Toranto's application for privileges at Rady Children's in violation of law and Dr. Toranto's rights; (ii) attempting in January 2016 to coerce Dr. Toranto into withdrawing his application; (iii) refusing to grant Dr. Toranto's repeated requests

for an interview; and (iv) refusing to otherwise provide Dr. Toranto and his application the procedurally fair consideration required under the Rady Children's Medical Staff bylaws and applicable law.

97.   Dr. Gosman, Rady Children's, the Rady Foundation, Rady Children's Medical Staff, and Dr. Jaffurs, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, combined and conspired with one another to deny Dr. Toranto procedurally fair consideration of his application for privileges at Rady Children's, and to deny Dr. Toranto entry into the market for pediatric craniofacial plastic surgery services in San Diego and Imperial Counties.

98.   As a result of the combination and conspiracy, trade has been restrained, as the public has been deprived of free and open competition in pediatric craniofacial plastic surgery services at Rady Children's and in San Diego and Imperial Counties, where Rady Children's is the only hospital where the practice is available.

99.   This combination and conspiracy has also resulted in longer patient wait times, and on information and belief, longer post-operative patient hospital stays and higher payer costs, all of which could be reduced if Dr. Toranto were properly granted admitting privileges at Rady Children's.  Among other things, Dr. Toranto's particular and exceptional skills and techniques as a pediatric craniofacial plastic surgeon potentially could, on information and belief: (i) reduce the post-operative length of a baby's hospital stay for certain highly complex craniofacial procedures by as much as 60% (from an average of 70 days to an average of 28 days, as Dr. Toranto has achieved elsewhere) with a correspondingly dramatic reduction in medical costs (an estimated savings of hundreds of thousands of dollars for each seriously disabled baby and his or her family).

100.  Defendants' combination and conspiracy is also preventing certain highly complex pediatric craniofacial plastic surgery procedures from being available at all to the children of San Diego and Imperial Counties, as Dr. Toranto is an expert in certain procedures that Dr. Gosman, on information and belief, does not perform.

101. UCI is liable to plaintiff for the actions of its employee, Dr. Jaffurs, on the basis of *respondeat superior*.

102. CHOC and CHOC Medical Staff are liable to plaintiff for the actions of its agent, Dr. Jaffurs, under the theory of agency.

103. Dr. Toranto has suffered, is suffering, and will continue to suffer, extensive harm to his professional reputation and goodwill.

104. Dr. Toranto has suffered, is suffering, and will continue to suffer, damages cognizable under Section 1 of the Sherman Act, as he has been restrained from entering the San Diego and Imperial County markets for his professional specialty and trade, developed over sixteen years of training and practice.

105. Dr. Toranto is entitled to recover threefold the damages he has sustained.

106. Dr. Toranto is entitled to recover the cost of this suit, including attorney's fees.

**Second Claim for Relief**

**(Monopoly - 15 U.S.C. § 2)**

**(Against Defendants Dr. Gosman, Rady Children's, Rady Foundation & Rady Children's Medical Staff)**

107. Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

108. Defendant Rady Children's is the only hospital serving San Diego and Imperial Counties that offers pediatric plastic and craniofacial surgery medical services. Rady Children's therefore has a monopoly on pediatric plastic and craniofacial surgery in San Diego and Imperial Counties.

109. Rady Children's and the Rady Foundation are partner entities based at the same location. While they are separate corporations, on information and belief, their interests are at all times aligned. The vast majority of physicians with privileges at Rady Children's are employed by the Rady Foundation. On information and belief, Rady Children's and the Rady Foundation endeavor to exclude from Rady Children's

any physicians who are not employed by the Rady Foundation. To that end, Rady Children's and the Rady Foundation have a pattern and practice of aggressively discouraging physicians who are not employed by the Rady Foundation from applying for privileges at Rady Children's, coercing applicants into withdrawing their applications (as they attempted to do here), or engaging in other anti-competitive conduct.

110. Dr. Toranto is not an employee of the Rady Foundation. Rady Children's has presumptively denied Dr. Toranto privileges without giving his application procedurally fair consideration, and without a single interview. On information and belief, this action was motivated by Rady Children's desire to exclude Dr. Toranto from Rady Children's because he is not employed by the Rady Foundation.

111. Rady Children's has improperly used its monopoly over pediatric plastic and craniofacial surgery services in San Diego and Imperial Counties to exclude Dr. Toranto from the market for those services, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

112. Dr. Gosman, the Rady Foundation, and the Rady Children's Medical Staff have combined and conspired with Rady Children's in its anticompetitive conduct to deny Dr. Toranto entry into the market for his professional services, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

113. Currently, the sole pediatric plastic and craniofacial surgery practitioner is a Rady Foundation employee, and all revenue generated by the practice flows to the Rady Foundation. The Rady Foundation has supported Rady Children's anti-competitive conduct in order to preserve this exclusive revenue stream, which would otherwise be partially diverted with the entry of Dr. Toranto into the market.

114. Dr. Gosman has supported and actively participated in Rady Children's anti-competitive conduct in order to preserve her position as the only pediatric plastic and craniofacial surgeon at Rady Children's, as she has reaped and stands to

reap substantial professional and economic benefits as the sole pediatric plastic and craniofacial surgeon in San Diego and Imperial Counties.

115. Influenced by its member, Dr. Gosman, Rady Children's Medical Staff has also supported Rady Children's anti-competitive conduct, and has participated in the sham peer review given to Dr. Toranto's application.

116. Dr. Toranto has suffered, is suffering, and will continue to suffer, extensive harm to his professional reputation and goodwill.

117. Dr. Toranto has suffered, is suffering, and will continue to suffer, damages, as he is unable to be employed in or practice his medical specialty in this district.

118. Dr. Toranto is entitled to recover threefold the damages he has sustained.

119. Dr. Toranto is entitled to recover the cost of this suit, including attorney's fees.

**Third Claim for Relief**

**(Bad Faith Professional Review – Cal Bus. & Prof. Code § 809.05 et seq.)**

**(Against Defendants Dr. Gosman, Rady Children's, Rady Foundation & Rady Children's Medical Staff)**

120. Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

121. On information and belief, Dr. Gosman has actively and improperly endeavored to prevent Rady Children's and Rady Children's Medical Staff from giving procedurally fair consideration to Dr. Toranto's application for privileges.

122. Dr. Gosman, Rady Children's and Rady Children's Medical Staff have performed acts and proceedings to presumptively deny Dr. Toranto's application for privileges at Rady Children's (i) without a reasonable effort to obtain facts, (ii) without the reasonable belief that such acts or proceedings are warranted by the facts, and (iii) with malice.

123. A reasonable effort to obtain the facts of the matter was not undertaken. Among other things, actions were taken to presumptively deny privileges to Dr.

Toranto without even speaking with him or informing him of any concerns. This is a *per se* violation, as any reasonable effort to obtain the facts of a matter relating to Dr. Toranto requires, at a minimum, asking him about it.

124. Actions were taken without the reasonable belief that they were warranted by the facts. As aforesaid, no reasonable effort has been made to obtain the facts, so no reasonable belief could be based on them. Rather, Dr. Gosman, Rady Children's and Rady Children's Medical Staff have acted in bad faith and for anti-competitive purposes without regard for the facts.

125. The aforementioned abject failure to provide fair consideration of Dr. Toranto's application is evidence of malice.

126. Though Dr. Toranto's application has been complete for nearly nine months, Defendants Rady Children's and Rady Children's Medical Staff have refused to grant Dr. Toranto a single interview or hearing, despite multiple requests.

127. Defendants' actions (and inactions) are arbitrary and capricious, and have been taken in bad faith.

128. Rady Foundation is liable to plaintiff for the actions of its employee, Dr. Gosman, on the basis of *respondeat superior*.

129. Dr. Toranto has suffered, is suffering, and will continue to suffer, extensive harm to his professional reputation and goodwill as a result of defendants' actions (and inactions).

130. Dr. Toranto has suffered, is suffering, and will continue to suffer, damages, as he is unable to engage in his specialty of pediatric craniofacial plastic surgery in this district.

**Fourth Claim for Relief**

**(Retaliation - Cal. Bus. & Prof. Code §§ 510-512, 2056)**

**(Against Defendants Dr. Jaffurs, UCI, CHOC & CHOC Medical Staff)**

131. Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

132. When Dr. Toranto was on the active medical staff at UCI and CHOC, Dr. Jaffurs, acting on feelings of personal animus and a desire to suppress competition, attempted to push one physician (Physician No. 1 previously mentioned herein) entirely out of CHOC, and attempted to limit the privileges of another physician (Physician No. 2).

133. Dr. Toranto took steps to protest Dr. Jaffurs' decision and attempts to discredit two competent physicians, in an effort to advocate for medically appropriate health care for patients.

134. In Dr. Toranto's professional opinion, Dr. Jaffurs' efforts to discredit the two physicians would impair CHOC's ability to provide appropriate health care to its patients.

135. Defendants Dr. Jaffurs and UCI retaliated against Dr. Toranto by creating a hostile work environment, and by making defamatory and false statements about Dr. Toranto to, among others, CHOC, CHOC Foundation, Rady Children's, Rady Children's Medical Staff, and Dr. Gosman.

136. Defendants' retaliatory acts have caused Dr. Toranto to suffer extensive harm to his professional reputation and goodwill. Dr. Toranto has suffered, is suffering, and will continue to suffer, damages, as he is unable to be employed in or practice his specialty in this district.

137. UCI is liable to plaintiff for the actions of its employee, Dr. Jaffurs, on the basis of *respondeat superior*.

138. CHOC and CHOC Medical Staff are liable to plaintiff for the actions of its agent, Dr. Jaffurs, under a theory of agency.

139. Defendants acted with malice, oppression, and/or fraud in retaliating against Dr. Toranto, entitling Dr. Toranto to punitive damages.

**Fifth Claim for Relief**

**(Retaliation - Cal. Labor Code § 1102.5)**

**(Against Defendants Jaffurs, UCI & CHOC)**

140.  Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

141.  As set forth above, defendant Dr. Jaffurs attempted to persuade Dr. Toranto to join him (Dr. Jaffurs) in making defamatory statements about other physicians at CHOC, and to engage in bad faith professional review of those physicians, in violation of California law.

142.  When Dr. Toranto refused to participate in Dr. Jaffurs' activities, which would have resulted in violation of California statutes and noncompliance with California rules and regulations, Dr. Jaffurs retaliated against Dr. Toranto by creating a hostile work environment, and by making false and defamatory statements about Dr. Toranto to CHOC, the CHOC Foundation, CHOC Medical Staff, Rady, Rady Foundation, Rady Children's Medical Staff, and Dr. Gosman.

143.  Defendant UCI is liable to plaintiff for the tort of retaliation committed by its employee, Dr. Jaffurs, under the theory of *respondeat superior*.

144.  Defendants CHOC and CHOC Medical Staff are liable to plaintiff for the tort of retaliation committed by Dr. Jaffurs, under the theory of agency.

145.  Dr. Toranto has suffered, is suffering, and will continue to suffer, damages as a result of this conduct, including but not limited to constructive termination and an inability to be employed in his specialty in this district.

146.  Defendants acted with malice, oppression, and/or fraud in retaliating against Dr. Toranto, entitling Dr. Toranto to punitive damages.

**Sixth Claim for Relief**

**(Defamation – Cal Civ. Code §§ 45-46)**

**(Against All Defendants)**

147. Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

148. Dr. Jaffurs made false written statements to the CHOC Foundation relating to Dr. Toranto's profession to Dr. Toranto's detriment, which constitute libel per se.

149. Dr. Jaffurs made false oral statements to the CHOC Foundation relating to Dr. Toranto's profession to Dr. Toranto's detriment, which constitute slander per se. These statements included the false and defamatory charge that Dr. Toranto refused to operate on Hispanic patients, and that Dr. Toranto refused to operate on low income patients.

150. Dr. Jaffurs made false written statements to Dr. Gosman relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute libel per se. These statements included the false and defamatory charge that Dr. Toranto "is not fit to operate on children."

151. Dr. Jaffurs made false oral statements to Dr. Gosman relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per se.

152. Dr. Jaffurs made false written statements to Rady Children's relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute libel per se.

153. Dr. Jaffurs made false oral statements to Rady Children's relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per se.

154. Dr. Jaffurs made false written statements to the Rady Foundation relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute libel per se.

155. Dr. Jaffurs made false oral statements to the Rady Foundation relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per se.

156. Dr. Jaffurs made false written statements to the Rady Children's Medical Staff relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute libel per se.

157. Dr. Jaffurs made false oral statements to the Rady Children's Medical Staff relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per se.

158. Dr. Gosman, UCI, CHOC, CHOC Medical Staff, Rady Children's, Rady Foundation, and Rady Children's Medical Staff forwarded, conveyed, or repeated Dr. Jaffurs' false and defamatory statements about Dr. Toranto to others. Therefore, each defendant is directly liable to plaintiff for the tort of defamation. Therefore, each defendant is directly liable to plaintiff for the torts of libel per se and slander per se.

159. Defendants knew the statements to be false, and the evidence available to defendants proved the statements were false. Defendants Dr. Gosman, Rady Children's, Rady Foundation, and Rady Children's Medical Staff failed to take reasonable care to determine the truth or falsity of the statements, as they did not, for example, contact Dr. Toranto or the numerous physicians who sent letters to Rady Children's refuting Dr. Jaffurs' statements and offering unconditional support to Dr. Toranto's application for admitting privileges.

160. Defendant UCI is liable to plaintiff for the tort of defamation committed by its employee, Dr. Jaffurs, on the basis of *respondeat superior*.

161. Defendants CHOC and CHOC Medical Staff are liable to plaintiff for the tort of defamation committed by Dr. Jaffurs under the theory of agency.

162. Defendant Rady Foundation is liable to plaintiff for the tort of defamation committed by its employee, Dr. Gosman, on the basis of *respondeat superior*.

163. Defendants Rady Children's and Rady Children's Medical Staff are liable to plaintiff for the tort of defamation committed by Dr. Gosman, under the theory of agency.

164. The defamatory statements made, forwarded, conveyed, or repeated by defendants have caused, are causing, and will continue to cause Dr. Toranto to suffer extensive harm to his reputation and goodwill and damages. The defamatory statements have prevented Dr. Toranto from obtaining employment at the CHOC Foundation, employment at the Rady Foundation, privileges at Rady Children's, and employment as a pediatric craniofacial plastic surgeon in this district.

165. Defendants acted with malice, oppression, and/or fraud in making and disseminating the defamatory statements about Dr. Toranto, entitling Dr. Toranto to punitive damages.

**Seventh Claim for Relief**

**(Cal. Labor Code § 1050 et seq.)**

**(Against Defendants Dr. Jaffurs, UCI & CHOC)**

166. Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

167. On information and belief, Dr. Jaffurs, acting in his professional capacity as a member of the UCI medical staff, made false statements and misrepresentations about Dr. Toranto to the CHOC Foundation, Rady, Rady Children's Medical Staff, Rady Foundation, and Dr. Gosman, all of whom understood the statements to be about Dr. Toranto.

168. On information and belief, Dr. Jaffurs, acting in his professional capacity as the chief of plastic surgery for CHOC, made false statements and misrepresentations about Dr. Toranto to the CHOC Foundation, Rady, Rady Children's Medical Staff, Rady Foundation, and Dr. Gosman, all of whom understood the statements to be about Dr. Toranto.

169. On information and belief, Dr. Jaffurs, acting in his professional capacity as the chief of plastic surgery for the CHOC Medical Staff, made false statements and misrepresentations about Dr. Toranto to the CHOC Foundation, Rady, Rady Children's Medical Staff, Rady Foundation, and Dr. Gosman, all of whom

understood the statements to be about Dr. Toranto.

170. Dr. Jaffurs' statements were made after Dr. Toranto tendered his resignation at UCI.

171. Dr. Jaffurs' statements were made to prevent or attempt to prevent Dr. Toranto from (i) obtaining employment at the CHOC Foundation, (ii) obtaining employment at the Rady Foundation, and (iii) obtaining employment as a pediatric craniofacial plastic surgeon anywhere in San Diego by preventing Dr. Toranto from obtaining privileges at Rady Children's. Such statements were made after Dr. Toranto tendered his resignation at UCI. On account of such statements, Dr. Toranto was denied employment at the CHOC Foundation, was denied employment at the Rady Foundation, and has been prevented from obtaining employment as a pediatric craniofacial plastic surgeon anywhere in San Diego by preventing Dr. Toranto from obtaining privileges at Rady Children's.

172. Defendant UCI is liable under California Labor Code sections 1052 and 1054 for knowingly permitting its employee, Dr. Jaffurs, to take the above-described actions and not taking appropriate action, and/or for failing to take all reasonable steps within its power to prevent Dr. Jaffurs from making the false and defamatory statements that caused Dr. Toranto harm.

173. Defendants CHOC and CHOC Medical Staff are liable under principles of agency for the acts of its agent Dr. Jaffurs.

174. Dr. Toranto has suffered, is suffering, and will continue to suffer, harm, as he has been prevented from obtaining employment at the CHOC Foundation, obtaining employment at the Rady Foundation, and obtaining employment as a pediatric craniofacial plastic surgeon anywhere in San Diego by preventing Dr. Toranto from obtaining privileges at Rady Children's.

175. Dr. Toranto is entitled to recover threefold the damages he has sustained.

**Eighth Claim for Relief**

**(Tortious Interference with Prospective Economic Relations)**

**(Against Defendants Dr. Jaffurs, UCI, CHOC, CHOC Medical Staff & Dr. Gosman, Rady Children's, Rady Foundation, Rady Medical Staff)**

176. Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

*Economic Relations with the CHOC Foundation*

177. While Dr. Toranto was employed at UCI and working at UCI/CHOC, Dr. Toranto was in a relationship with the CHOC Foundation, an entity closely affiliated with CHOC, which employed many of the physicians who had admitting privileges at CHOC, including a large number of Dr. Toranto's friends and colleagues. The relationship would have resulted in economic benefit to Dr. Toranto, as he would have been able to continue to practice his medical specialty at CHOC and UCI, for which he would have been compensated.

178. In 2015, Dr. Toranto entered into employment discussions with the CHOC Foundation, where he would have been able to continue his medical practice at UCI/CHOC.

179. Dr. Jaffurs knew of the relationship Dr. Toranto had with CHOC and the CHOC Foundation, and knew that Dr. Toranto was seeking employment with the CHOC Foundation.

180. Dr. Jaffurs intended to disrupt the relationship between Dr. Toranto and CHOC, and between Dr. Toranto and the CHOC Foundation.

181. Dr. Jaffurs engaged in wrongful conduct by making false and defamatory statements to the CHOC Foundation about Dr. Toranto, as described above.

182. Dr. Jaffurs disrupted Dr. Toranto's relationship with the CHOC Foundation, as the CHOC Foundation ultimately did not hire Dr. Toranto.

183. Dr. Toranto was harmed, as he was unable to continue his medical practice at UCI/CHOC outside the administrative purview of Dr. Jaffurs, and ultimately

took a leave of absence from CHOC to get away from Dr. Jaffurs.

184. Dr. Jaffurs' defamatory statements were a substantial factor in causing the CHOC Foundation to not hire Dr. Toranto.

185. Defendant UCI is liable to plaintiff for the tort committed by its employee, Dr. Jaffurs, under the theory of *respondeat superior*

186. Defendants CHOC and CHOC Medical Staff are liable to plaintiff for the tort committed by Dr. Jaffurs, under the theory agency.

*Economic Relations with Rady Children's*

187. In late 2015, Dr. Toranto applied for admitting privileges at Rady Children's. This relationship was likely to have resulted in economic benefit to Dr. Toranto, absent wrongful interference. Dr. Toranto would have been able to continue to practice his medical specialty at Rady Children's, for which he would have been compensated. The likelihood that Dr. Toranto would gain admitting privileges at Rady Children's is evidenced by positive feedback that he received from individuals at CHOC and UC San Diego, unqualified letters of support provided by colleagues in support of his application to Rady Children's, his blemish-free professional record, and the fact that he had been credentialed at each and all of the numerous hospitals to which he had ever applied without incident or delay.

188. Dr. Jaffurs and Dr. Gosman knew of the relationship between Dr. Toranto and Rady Children's, becoming aware soon after Dr. Toranto tendered his resignation at UCI that Dr. Toranto was applying for admitting privileges at Rady Children's.

189. Dr. Jaffurs and Dr. Gosman intended to disrupt the relationship, and sought to have Rady Children's deny Dr. Toranto admitting privileges.

190. Dr. Jaffurs engaged in wrongful conduct by making false and defamatory statements about Dr. Toranto to Rady Children's.

191. Dr. Gosman engaged in wrongful conduct by disseminating and perpetuating Dr. Jaffurs' false and defamatory statements about Dr. Toranto to Rady Children's, Rady Children's Medical Staff, and Rady Foundation.

192. Rady Children's has indicated to Dr. Toranto that Dr. Toranto's privileges will be prospectively denied, though there is no objective basis for Rady's determination. Thus, the relationship between Dr. Toranto and Rady Children's has been disrupted.

193. Dr. Toranto has been harmed, as he is unable to practice pediatric craniofacial plastic surgery in San Diego or Imperial Counties.

194. Dr. Jaffurs' and Dr. Gosman's false and defamatory statements are the primary and substantial factor in causing the harm suffered by Dr. Toranto as a result of Rady Children's unwillingness to give procedurally fair consideration to his application for privileges.

195. Defendant UCI is liable to plaintiff for the tort committed by its employee, Dr. Jaffurs, under the theory of *respondeat superior*

196. Defendants CHOC and CHOC Medical Staff are liable to plaintiff for the tort committed by Dr. Jaffurs, under the theory of agency.

197. Defendant Rady Foundation is liable to plaintiff for the tort committed by its employee, Dr. Gosman, under the theory of *respondeat superior*.

198. Defendants Rady Children's and Rady Children's Medical Staff are liable to plaintiff for the tort committed by Dr. Gosman, under the theory of agency.

**Ninth Claim for Relief**

**(Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq.)**

**(Against all Defendants)**

199. Dr. Toranto hereby incorporates the paragraphs above, each as though fully set forth herein.

200. Defendants have engaged in the following unlawful, unfair, and/or fraudulent acts, in violation of Cal. Bus. & Prof. Code § 17200 et seq.:

a. The actions by defendants Dr. Gosman, Rady Children's, Rady Foundation, Rady Children's Medical Staff, and Dr. Jaffurs constitute a violation of 15 U.S.C. § 1, as alleged in the First Claim for Relief, which allegations are incorporated as though fully set forth herein.

b. The actions by defendants Dr. Gosman, Rady Children's, Rady Foundation, Rady Children's Medical Staff, and Dr. Jaffurs constitute a violation of 15 U.S.C. § 2, as alleged in the Second Claim for Relief, which allegations are incorporated as though fully set forth herein.

c. The actions by defendants Dr. Gosman, Rady Children's, and Rady Children's Medical Staff constitute bad faith professional review, in violation of Cal. Bus. & Prof. Code § 809.05 et seq., as alleged in the Third Claim for Relief, which allegations are incorporated as though fully set forth herein.

d. The actions by defendants Dr. Jaffurs, UCI, and CHOC constitute illegal retaliation, in violation of Cal. Bus. & Prof. Code §§ 510-512, 2056, as alleged in the Fourth Claim for Relief, which allegations are incorporated as though fully set forth herein.

e. The actions by defendants Dr. Jaffurs, UCI, and CHOC constitute illegal retaliation, in violation of Cal. Labor Code § 1102.5, as alleged in the Fifth Claim for Relief, which allegations are incorporated as though fully set forth herein.

f. The false and defamatory statements made by Dr. Jaffurs and perpetuated or repeated by his co-defendants constitutes illegal defamation in violation of Cal. Civ. Code §§ 45-46, as alleged in the Sixth Claim for Relief, which allegations are incorporated as though fully set forth herein.

g. The actions by defendants Dr. Jaffurs, UCI, and CHOC in attempting to prevent Dr. Toranto from obtaining employment after he tendered

his resignation from UCI constitute violations of Cal. Labor Code § 1050 et seq. as alleged in the Seventh Claim for Relief, which allegations are incorporated as though fully set forth herein.

201. The above-described unlawful, unfair, and/or fraudulent actions by defendants have harmed Dr. Toranto by preventing Dr. Toranto from: (i) obtaining employment in Orange County with the CHOC Foundation; (ii) obtaining employment in San Diego with the Rady Foundation; (iii) obtaining privileges at Rady Children's; and (iv) receiving procedurally fair consideration of his application for privileges at Rady Children's.

202. Dr. Toranto is entitled to injunctive relief, restraining defendants from engaging in further defamatory, retaliatory, and anti-competitive conduct, and requiring that Rady Children's and Rady Children's Medical Staff give Dr. Toranto's application for privileges fair consideration.

**Prayer for Relief**

Based on the allegations above, Plaintiff Jason Toranto seeks judgment against defendants as follows:

a. That defendants be restrained from engaging in further defamatory, retaliatory, and anti-competitive conduct, and that Rady Children's and Rady Children's Medical Staff be required to give Dr. Toranto's application for privileges fair consideration, in accordance with applicable law and the Rady Children's Medical Staff Bylaws;

b. That plaintiff recover from defendants, jointly and severally, threefold his damages suffered by reason of the federal antitrust law violations and violation of Cal. Labor Code § 1050 et seq.;

c. That plaintiff recover from defendants, jointly and severally, his general and special damages according to proof and trial;

d. That plaintiff recover from defendants, jointly and severally, punitive and exemplary damages for retaliation and defamation;

e.   For attorneys' fees and costs; and

f.   For such other relief as the Court may deem just and proper.

Dated:   July 1, 2016                                FITZGERALD KNAIER LLP

                                        By: /s/ Kenneth M. Fitzgerald
                                            Kenneth M. Fitzgerald, Esq.
                                            Robert G. Knaier, Esq.
                                            Howard C. Wu, Esq.
                                            Attorneys for Plaintiff
                                            Jason Toranto

**Jury Demand**

Plaintiff Jason Toranto hereby demands a trial by jury for all issues so triable.

DATED: July 1, 2016

FITZGERALD KNAIER LLP

By: /s/ Kenneth M. Fitzgerald
Kenneth M. Fitzgerald, Esq.
Robert G. Knaier, Esq.
Howard C. Wu, Esq.
Attorneys for Plaintiff
Jason Toranto