1

FITZGERALD KNAIER LLP

2
    Kenneth M. Fitzgerald, Esq. (SBN: 142505)
    kfitzgerald@fitzgeraldknaier.com

3
    Robert G Knaier, Esq. (SBN: 234466)
    rknaier@fitzgeraldknaier.com

4
    Howard C. Wu, Esq. (SBN: 274039)

5
    hwu@fitzgeraldknaier.com

6
402 West Broadway, Suite 1400
San Diego, California 92101

7
Tel:  (619) 241-4810

8
Fax:  (619) 955-5318

9
Attorneys for Plaintiff Jason Toranto

10
**UNITED STATES DISTRICT COURT**

11
**SOUTHERN DISTRICT OF CALIFORNIA**

12

13
**Jason Toranto,** *an individual,*

14
                Plaintiff,

15
    v.

16
**Daniel Jaffurs,** *an individual*; **Amanda
Gosman,** *an individual*; **Rady Children's
Hospital-San Diego,** *a California*

17
*corporation*; **Rady Children's Specialists
of San Diego,** *an unincorporated medical*

18
*practice foundation*; **Rady Children's
Medical Staff**, *an unincorporated*

19
*association*; **Children's Hospital of
Orange County,** *a California corporation*;

20
and **CHOC Medical Staff**, *an
unincorporated association*

21

22
              Defendants.

23

24

25

26

27

28

---

Case No.:    3:16-cv-01709-JAH-NLS

**Second Amended Complaint for:**

1. Conspiracy in Restraint of Trade
2. Monopoly
3. Bad Faith Professional Review
4. Retaliation (Cal. Bus. & Prof. Code §§ 510-512, 2056)
5. Retaliation (Cal. Labor Code § 1102.5)
6. Defamation
7. Violation of Labor Code § 1050 et seq.
8. Tortious Interference with Prospective Economic Advantage
9. Unfair Competition

**Jury Trial Demanded**

Plaintiff Jason Toranto MD, for his complaint against defendants, alleges as follows:

**Summary of Case**

1.    This action is brought by Dr. Jason Toranto, a highly trained and exceptionally qualified pediatric plastic and craniofacial surgeon, who has suffered and continues to suffer unlawful retaliation from Dr. Daniel Jaffurs, a vindictive and abusive former colleague at the UC Irvine School of Medicine ("UCI") and Children's Hospital of Orange County ("CHOC").  At every step in his career, Dr. Toranto has accumulated awards, accolades, and admiration from supervisors, colleagues, and peers.  He met or exceeded all applicable requirements at every hospital with which he has ever been affiliated, including UCI and CHOC.  He has never been subject to any disciplinary action at any time, at any hospital, ever.

2.    In contrast, Dr. Jaffurs is a volatile personality with a checkered professional record, who has a history of abusive conduct toward others.  Among other things, Dr. Jaffurs has engaged in a pattern and practice of routinely maligning and undermining the careers of surgeons he does not like, or whom he considers an economic threat to his pediatric plastic and craniofacial surgery practice in Orange County.  Dr. Jaffurs attempted to enlist Dr. Toranto as an accomplice in his anti-competitive efforts to eliminate competing surgeons in the Orange County market—efforts that Dr. Jaffurs referred to in writing as "weeding the garden."  Dr. Toranto refused to assist him.  Angered by this refusal, and perceiving Dr. Toranto as a new competitive threat, Dr. Jaffurs turned on Dr. Toranto.  Dr. Jaffurs did so by making false and defamatory statements about Dr. Toranto to many, including physicians and administrators at UCI and CHOC.

3.    Dr. Jaffurs' false and defamatory statements led the CHOC Pediatric Subspecialty Faculty (the "CHOC Foundation") to deny employment to Dr. Toranto.  Boasting of his success in destroying Dr. Toranto's employment opportunity with the CHOC Foundation, Dr. Jaffurs bragged to Dr. Toranto, in

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1   writing, that "you will not be hired.  This was done at my request."

2       4.    Then, after Dr. Toranto decided to leave Orange County and relocate to

3   San Diego, Dr. Jaffurs continued on his vendetta by making false and defamatory

4   statements about Dr. Toranto to Rady Children's Hospital, the sole supplier of

5   pediatric craniofacial plastic surgery services in San Diego and Imperial Counties; to

6   Rady Children's Specialists of San Diego (the "Rady Foundation"); and to the

7   University of California, San Diego ("UCSD" and, together with the Rady

8   Foundation, the "Rady Joint Employers").  Through a single-employment model,

9   the Rady Joint Employers jointly employ the vast majority of physicians who

10  practice medicine at Rady Children's Hospital.

11      5.    Dr. Jaffurs did this illegally and in concert with Dr. Amanda Gosman, the

12  chief of plastic surgery at Rady Children's and a willing co-conspirator.  Dr. Gosman

13  was eager to conspire with Dr. Jaffurs because in 2015 she became the sole pediatric

14  craniofacial plastic surgeon at Rady Children's, after the only other pediatric

15  craniofacial plastic surgeon there retired in late 2015.  That surgeon, Dr. Steven

16  Cohen (who is not a defendant), was not just Rady Children's only other pediatric

17  craniofacial plastic surgeon; he was also the only surgeon at Rady Children's

18  performing a range of certain highly complex pediatric craniofacial plastic surgery

19  procedures, and Dr. Gosman hoped to perform those surgeries upon Dr. Cohen's

20  retirement.  Dr. Toranto is an expert in those highly complex procedures and

21  therefore would be the surgeon to whom those cases would most likely and

22  appropriately go.  Consequently, Dr. Gosman viewed Dr. Toranto's arrival as a

23  competitive threat not only to her status as the sole practicing pediatric craniofacial

24  plastic surgeon at Rady Children's, but also to her plans to assume the complex

25  procedures Dr. Cohen had handled.

26      6.    Dr. Jaffurs and Dr. Gosman poisoned the well with the Rady Joint

27  Employers and with members of the Rady Children's Medical Staff, all of which

28  have since conspired with Drs. Jaffurs and Gosman to deny Dr. Toranto

1    procedurally fair consideration of his application for admitting privileges at Rady

2    Children's Hospital.

3         7.    Fully supportive of Dr. Jaffurs' and Dr. Gosman's anti-competitive

4    campaign against Dr. Toranto, the Rady Children's Medical Staff informed Dr.

5    Toranto (in violation of its bylaws, applicable law, and Dr. Toranto's rights) that his

6    application for privileges at Rady Children's Hospital would presumptively be

7    denied.  Rady Children's made its decision before anybody in the credentialing

8    process at Rady Children's even met with or spoke to Dr. Toranto, and without

9    going through any meaningful or objective peer review process to assess his

10   qualifications.  After informing Dr. Toranto that his application would be

11   presumptively denied, Rady Children's threatened Dr. Toranto, telling him that if he

12   did not withdraw his application, Rady Children's would report him to the California

13   Medical Board.  This report, called an 805 report, would then go to a federal

14   database, ending his medical career.

15        8.    However, Dr. Toranto refused to withdraw his application.  This left the

16   Rady Defendants in a quandary.  On the one hand, they did not want to admit Dr.

17   Toranto to Rady Children's Hospital.  On the other hand, they had no legitimate

18   basis for denying his application, and their attempt to intimidate Dr. Toranto into

19   withdrawing his application had failed.

20        9.    Thus, even though the Rady Children's Medical Staff takes an average of 75

21   days to decide an application for privileges, and even though it appears that no other

22   application has ever taken more than twelve months to decide, the Rady Children's

23   Medical Staff spent more than *two years* fishing (without success) for a pretext to deny

24   Dr. Toranto's application, likely hoping that the interminable delay would drive Dr.

25   Toranto to capitulate and withdraw his application.

26        10.   Eventually however, with Dr. Toranto's application having been pending

27   for an obscene **840 days**, the Rady Defendants simply could no longer maintain the

28   charade of their sham peer review, ████████████████████

                              - 4 -              Second Amended Complaint
                                                *Toranto v. Jaffurs, et al.*

1

2

3

4

5       11.   However, the monopolist has many anticompetitive tools in its toolkit and

6  Rady Children's illegal restraint of trade is continuing unabated, notwithstanding the

7  grant of privileges.

8       12.   The above described illegal, defamatory, and anti-competitive conduct has

9  harmed patients in the relevant market.  In this case, those patients are children, and

10  most acutely, severely disabled babies.  The plastic surgery department at Rady

11  Children's Hospital is among the hospital's worst departments for patient wait times,

12  according to the hospital's own publications.  As a result, Rady's anti-competitive

13  conduct has not only wrongly deprived children, babies, and their families of

14  physician choice, but also has prolonged their waits.  Moreover, Dr. Toranto's

15  particular and exceptional skills and techniques as a pediatric craniofacial plastic

16  surgeon potentially could: (i) reduce the post-operative length of a baby's hospital

17  stay for certain highly complex craniofacial procedures by as much as 60% (from an

18  average of 70 days to an average of 28 days, as Dr. Toranto has achieved elsewhere);

19  (ii) dramatically reduce medical costs as a result of so reducing post-operative

20  hospital stays (an estimated savings of hundreds of thousands of dollars for each

21  seriously disabled baby and his or her family); and (iii) make available certain

22  complex procedures that have not otherwise been available at all to the children of

23  San Diego and Imperial Counties.  As a result, the defendants' unlawful actions

24  damage not only Dr. Toranto, but also injure competition to the detriment of

25  seriously disabled infants and children, and the insurers and government sources of

26  funding that pay for their medical care.

27       13.   Sadly, it appears that the anti-competitive conduct Dr. Toranto has faced at

28  Rady Children's is likely part of a broader unlawful program at Rady Children's.  For

example, it appears to be Rady Children's *modus operandi* to threaten physicians it does not want to admit with denial and a report to the California Medical Board, in order to coerce those physicians into withdrawing their applications.  Indeed, since 2008, the Rady Children's Medical Staff has denied zero applications for privileges, but an unspecified number of applicants have "withdrawn."  Moreover, a recently published study has documented substantial increases in anti-competitive conduct by hospitals in California when the percentage of physicians employed by a hospital-affiliated foundation increased, or when local market share was highly concentrated in a small number of hospitals.  Rady has both symptoms in extremes.  The Rady Foundation employs the majority of physicians practicing at Rady Children's.  And whereas the study reported dangerous levels of market concentration as being above 2,500 on a 10,000 point scale (based on the Herfindahl-Hirschman Index (HHI) used by the US Department of Justice and Federal Trade Commission to evaluate the risk of anti-competitive abuse from market concentration), Rady's score on the HHI is likely in excess of *8,100* given Rady Children's pediatric dominance in all of San Diego and Imperial County.  Rady Children's HHI score approaches 10,000 for specialty pediatric practices like complex craniofacial plastic surgery.

### Parties

14.    Plaintiff Jason Toranto, MD ("Dr. Toranto") is an individual residing in San Diego County, California.  Dr. Toranto is, and at all times material to this complaint has been, a physician licensed to practice medicine in the State of California.  Dr. Toranto is a Board Certified general surgeon, a Board Certified plastic and reconstructive surgeon, and a fellowship-trained pediatric plastic and craniofacial surgeon.  Dr. Toranto is a Fellow of the American College of Surgeons. Dr. Toranto is a member in good standing of the medical staff at Children's Hospital of Orange County, Scripps Memorial Hospital, Scripps Mercy Hospital, Scripps Encinitas Hospital, Sharp Memorial Hospital, Sharp Grossmont Hospital, and Alvarado Hospital.  Dr. Toranto is currently the Chief of Plastic Surgery at Senta

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

Medical Clinic in San Diego, California.

15.    Defendant Daniel Jaffurs, MD ("Dr. Jaffurs") is an individual who, on information and belief, resides in Orange County, California.  Dr. Jaffurs is a pediatric plastic and craniofacial surgeon at CHOC and at UCI.

16.    Defendant Amanda Gosman, MD ("Dr. Gosman") is an individual who, on information and belief, resides in San Diego County, California.  Dr. Gosman is, and at all times material to this complaint has been, a pediatric plastic and craniofacial surgeon at Rady Children's Hospital in San Diego, California.  On information and belief, Dr. Gosman is, and at all times material to this complaint has been, an employee of defendant Rady Children's Specialists of San Diego and UCSD.

17.    Defendant Rady Children's Hospital-San Diego ("Rady" or "Rady Children's") is a California corporation.  Rady Children's provides facilities for the delivery of medical services in San Diego, California, and grants privileges for the performance of such medical services through the Rady Children's Medical Staff, a separate unincorporated association, composed of physicians and other healthcare providers.

18.    Defendant Rady Children's Specialists of San Diego (the "Rady Foundation") is an unincorporated medical practice foundation.  The Rady Foundation is a partner entity closely affiliated with Rady Children's and UCSD. The Rady Foundation and UCSD jointly employ the majority of the physicians who have admitting privileges at Rady Children's Hospital.

19.    Defendant Rady Children's Medical Staff (together with Rady Children's, the Rady Foundation, and Dr. Gosman, the "Rady Defendants") is an unincorporated association composed of physicians and other healthcare providers, which provides medical services to Rady Children's Hospital.  On information and belief, the vast majority of the physician members of the Rady Children's Medical Staff practicing at Rady are employed by the Rady Joint Employers, though a small

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1  number of physicians are employed at other organizations (such as private clinics)

2  and have admitting privileges at Rady Children's Hospital.

3      20.   Defendant Children's Hospital of Orange County ("CHOC") is a

4  California corporation.  CHOC provides facilities for the delivery of medical services

5  in Orange, California, and grants privileges for the performance of such medical

6  services through a medical staff, a separate unincorporated association, composed of

7  physicians and other healthcare providers.

8      21.   Defendant CHOC Medical Staff is an unincorporated association

9  composed of physicians and other healthcare providers, who provides medical

10  services to CHOC.

11                          **Jurisdiction and Venue**

12      22.   Pursuant to 28 U.S.C. § 1331, the Court has subject-matter jurisdiction over

13  plaintiff's claims under 15 U.S.C. §§ 1-2 (The Sherman Act).  The Court also has

14  jurisdiction under 28 U.S.C. § 1337 for regulation and protection of commerce.  This

15  Court has jurisdiction under 28 U.S.C. § 1367 over the pendant state law claims.

16      23.   This Court has personal jurisdiction over defendants, all of whom reside in

17  California, and are thereby subject to the jurisdiction of a court of general

18  jurisdiction in the State of California.  Defendants Dr. Gosman and the Rady

19  Defendants reside in this judicial district.  Defendant Dr. Jaffurs resides in the State

20  of California, and purposely directed defamatory and knowingly false comments

21  about plaintiff to co-defendants in this district.  As more particularly set forth below,

22  defendants CHOC and CHOC Medical Staff are liable for Dr. Jaffurs' unlawful

23  conduct in this district, including his defamatory and knowingly false comments

24  about plaintiff to co-defendants in this district.

25      24.   Venue in the Southern District of California is proper under 28 U.S.C.

26  § 1391(b) because all of the defendants are residents of the State of California, and

27  because the defendants' actions occurred in California and in this judicial district.

28

**Trade and Commerce**

25.   Defendants' general business activities have at all times relevant to this complaint had a substantial effect on interstate trade and commerce.

26.   In connection with the sale, marketing, and billing of medical services, defendants have used and continue to use instrumentalities of interstate commerce, including but not limited to the United States Postal Service and the Internet.

27.   Defendants sell, market, and bill medical services to, among others, Medi-Cal, which receives and uses federal monies.

28.   Defendants purchase equipment and supplies from pharmaceutical and medical device companies that sell and market their products in interstate commerce.

29.   The specialty of pediatric craniofacial plastic surgery is a highly specialized medical practice.  As a matter of best outcomes, patient safety, and practical economics, the practice of pediatric craniofacial plastic surgery (and especially *complex* pediatric craniofacial plastic surgery) is viable only for medical facilities dedicated to pediatric patients, where the practice has access to a continuous flow of pediatric craniofacial surgery patients, and where there exists a concentration of pediatric specialists who can provide all the specialty care necessary before, during, and after the surgery, particularly for the many pediatric craniofacial plastic surgery patients who are severely disabled babies with multiple complicated medical issues.

30.   Only one hospital serving San Diego and Imperial Counties offers the practice environment necessary for pediatric craniofacial plastic surgery—Rady Children's.  Thus, all three major hospital systems in San Diego—Sharp, Scripps, and UCSD—refer all pediatric craniofacial plastic surgery candidates to Rady Children's, even though the Sharp and Scripps hospital systems are otherwise the main competitors of Rady and UCSD (which are affiliates).

31.   At the time this suit was filed, Dr. Gosman was the only practitioner of pediatric craniofacial plastic surgery at Rady Children's, and thus the only practitioner in all of San Diego and Imperial Counties.

32.    The conspiracy among defendants to deny Dr. Toranto admitting privileges at Rady Children's Hospital denied Dr. Toranto the ability to practice pediatric craniofacial plastic surgery in San Diego and Imperial Counties, in effect denying him entry to the market for his specialized skills, developed over sixteen years of training and practice.

33.    Defendants' actions in denying Dr. Toranto procedurally fair consideration of his application for admitting privileges at Rady Children's have affected interstate commerce to the detriment of child patients, including seriously disabled babies, and their families by (i) reducing physician choice; (ii) increasing wait times; (iii) on information and belief, increasing the length of post-operative hospital stays; (iv) on information and belief, increasing medical costs; (v) affecting payments to and from those who pay for their services (including out-of-state insurers and federally-funded insurance programs); (vi) affecting payments to other interstate entities including pharmaceutical and medical device companies; and (vii) on information and belief, completely denying the children of San Diego and Imperial Counties access to certain complex pediatric craniofacial plastic surgery procedures that are performed by Dr. Toranto but, on information and belief, not by Dr. Gosman, rendering them unavailable at Rady Children's.

### No Immunity Under 42 U.S.C. § 11101 et seq.

34.    The Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. §§ 11111, 11112(a), provides limited civil immunity for certain persons with respect to "professional review actions" that meet certain criteria.  None of the defendants are eligible for HCQIA's limited civil immunity for the reasons stated below.

35.    As to all defendants, the illegal activities described in this complaint include illegal activities that occurred before Dr. Toranto's application for privileges at Rady Children's was complete, and therefore before the credentialing process had even begun.  Illegal activities that occurred before Dr. Toranto's application for privileges at Rady Children's was complete, and therefore before the credentialing process had

1  even begun, were not and cannot be "professional review actions" under HCQIA.

2  Therefore, defendants are not entitled to the limited civil immunity under HCQIA

3  section 11151 with respect to such illegal activities.

4      36.   As to all defendants, the illegal activities described in this complaint which

5  occurred after Dr. Toranto's application for privileges at Rady Children's was

6  complete were part of an illegal conspiracy which commenced before the

7  credentialing process had even begun.  This illegal conspiracy which commenced

8  before the credentialing process had even begun was not and cannot be a

9  "professional review action" under HCQIA.  Therefore, defendants are not entitled

10  to the limited civil immunity under HCQIA section 11151 with respect to such

11  conspiracy.

12      37.   In January 2016, Rady Children's informed Dr. Toranto that his application

13  for admitting privileges would presumptively be denied.  Whatever "peer review"

14  Rady Children's claims to have done has been a sham.  Rady Children's made its

15  decision without ever meeting with or talking to Dr. Toranto, and without advising

16  him of any problems with his application.  Rady Children's has also received at least

17  19 unqualified letters of support for Dr. Toranto's application from physicians,

18  administrators, and staff members.  Four of those letters, from different physicians,

19  were sent to Rady Children's in a supplemental package on March 21, 2016 and

20  specifically addressed Dr. Jaffurs' defamatory statements about Dr. Toranto,

21  accurately describing them as "entirely unacceptable," "clearly false," "completely

22  unprofessional," a "personal vendetta" and "having no basis in fact."  At the time

23  this lawsuit was filed, Rady Children's had not contacted any of those four

24  physicians to discuss those letters.  Moreover, Dr. Toranto's application was

25  complete nearly ten months before this lawsuit was filed, but as of the date this

26  lawsuit was filed, Rady Children's had yet to grant him a single interview or hearing

27  despite repeated requests.  Rady Children's failure to conduct any kind of meaningful

28  or objective peer review demonstrates that Rady Children's has never been interested

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

in giving Dr. Toranto's application fair consideration.  Therefore, defendants are not entitled to the limited civil immunity of HCQIA, because a sham peer review is not a "professional review action" under HCQIA section 11151.

38.   Defendants are not entitled to the limited civil immunity of HCQIA because any action or recommendation made by Defendants that may constitute a "professional review action" in connection with the presumptive denial of Dr. Toranto's application for privileges at Rady Children's and the denial of procedurally objective and fair consideration of his application does not satisfy the requirements of the safe harbor.  Specifically, as to each and any such "professional review action":

> a.  It was not taken in the reasonable belief that it was in the furtherance of quality health care.  Rather, it was taken to further anti-competitive and illegal purposes for personal benefit.

> b.  A reasonable effort to obtain the facts of the matter was not undertaken.  Among other things, actions were taken and recommendations were made to presumptively deny privileges to Dr. Toranto without even speaking with him or informing him of any concerns.  This is a *per se* violation of the safe harbor, as any reasonable effort to obtain the facts of a matter relating to Dr. Toranto requires, at a minimum, asking him about it.

> c.  Dr. Toranto was not offered adequate notice and hearing procedures or any other fair procedures.  Rather, Dr. Toranto was advised that his application was being presumptively denied without ever having spoken to him or having advised him that there was any issue with his application.  Moreover, Rady Children's refused to interview Dr. Toranto, despite numerous requests, until after the involvement of this Court.  Even then, the only interview ever granted to Dr. Toranto occurred more than 13 months after Dr. Toranto's application was

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1   complete.  Rather than providing fair procedures, the Rady Defendants
2   conducted a sham peer review, a charade maintained for an obscene
3   840 days.

4       d.  Action was not taken in the reasonable belief that the action was
5          warranted by the facts known after a reasonable effort to obtain the
6          facts.  No reasonable effort was made to obtain the facts, so no
7          reasonable belief could be based on them.  Rather, the Rady
8          Defendants have acted in bad faith and for anti-competitive purposes
9          for personal gain without regard for the facts.

10      39.   Accordingly, defendants cannot avail themselves of the protection of the
11   limited civil immunity under HCQIA Section 11111(a)(1).

12      40.   The protection from civil liability provided by HCQIA section 11111(a)(2)
13   to individuals providing information to professional review bodies is not available to
14   Dr. Jaffurs because the information he provided to Rady Children's was false, and he
15   knew such information was false.

16                         **Respondeat Superior/Agency**

17      41.   At all times material to this complaint, Dr. Jaffurs has been the chief of
18   plastic surgery at CHOC.  Dr. Jaffurs' unlawful conduct set forth in this complaint
19   was conducted in his professional capacity as chief of plastic surgery at CHOC.
20   CHOC is liable to plaintiff for the unlawful conduct of Dr. Jaffurs, under the theory
21   of agency.

22      42.   At all times material to this complaint, Dr. Jaffurs has been the chief of
23   plastic surgery of the CHOC Medical Staff.  Dr. Jaffurs' unlawful conduct set forth
24   in this complaint was conducted in his professional capacity as chief of plastic
25   surgery of the CHOC Medical Staff.  CHOC Medical Staff is liable to plaintiff for
26   the unlawful conduct of Dr. Jaffurs, under the theory of agency.

27      43.   At all times material to this complaint, Dr. Gosman has been an employee
28   of Rady Foundation and UCSD.  Dr. Gosman's unlawful conduct set forth in this

1  complaint was conducted in her professional capacity as an employee of Rady

2  Foundation and UCSD.  Rady Foundation is liable to plaintiff for the unlawful

3  conduct of Dr. Gosman, under the theory of *respondeat superior*.

4      44.  At all times material to this complaint, Dr. Gosman has been the chief of

5  plastic surgery at Rady Children's.  Dr. Gosman's unlawful conduct set forth in this

6  complaint was conducted in her professional capacity as chief of plastic surgery at

7  Rady Children's.  Rady Children's is liable to plaintiff for the unlawful conduct of

8  Dr. Gosman, under the theory of agency.

9      45.  At all times material to this complaint, Dr. Gosman has been the chief of

10  plastic surgery of the Rady Medical Staff.  Dr. Gosman's unlawful conduct set forth

11  in this complaint was conducted in her professional capacity as chief of plastic

12  surgery of the Rady Medical Staff.  Rady Medical Staff is liable to plaintiff for the

13  unlawful conduct of Dr. Gosman, under the theory of agency.

14      46.  Plaintiff is informed and believes, and thereon alleges, that at all times

15  material to this complaint, Dr. Gosman, and each and all of the Rady Defendants

16  acted as the agent of each other, and were at all times acting within the course and

17  scope of such agency, with the permission and consent of each other.

18      47.  Plaintiff is informed and believes, and thereon alleges, that at all times

19  material to this complaint, Dr. Jaffurs, CHOC, and CHOC Medical Staff acted as the

20  agent of each other, and were at all times acting within the course and scope of such

21  agency, with the permission and consent of each other.

22                                      **Facts**

23      48.  At every step in his career, Dr. Toranto has accumulated awards, accolades,

24  and admiration from supervisors, colleagues, and peers.  He met or exceeded all

25  applicable requirements at every hospital with which he has ever been affiliated,

26  including UCI and CHOC.  He has never been subject to any disciplinary action at

27  any time, at any hospital, ever.

28      49.  Praise for Dr. Toranto transmitted to Rady Children's in connection with

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

Dr. Toranto's application includes the following statements, in writing, from leading physicians and hospital administrators:

    a.   The CEO of CHOC described Dr. Toranto as having "a unique set of talents" with which he performed highly complex craniofacial surgeries "at a level that was not present at CHOC until he arrived" and that "he elevated the level of surgical expertise at [CHOC] in the realm of craniofacial surgery." She further described Dr. Toranto as "communicat[ing] effectively with hospital administration and [bringing] together disparate members of the medical staff into cohesive teams."

    b.   A plastic and reconstructive surgeon at UCI described Dr. Toranto as "a consummate professional who unquestionably possesses all of the necessary skills, experience, competence and other attributes necessary for a surgeon performing complicated pediatric craniofacial cases."

    c.   A leading pediatric craniofacial plastic surgeon described Dr. Toranto as "a highly qualified and outstanding pediatric plastic and craniofacial surgeon." This surgeon further stated that he has "operated with and observed [Dr. Toranto] extensively on immensely complicated pediatric plastic and craniofacial surgery cases. In fact, some of those cases are of such extraordinary complexity that Dr. Toranto is in an elite group of surgeons in the world who can perform them. Any child would be very lucky to have Dr. Toranto as their surgeon" and "Rady's would be very lucky indeed to have him."

    d.   Another leading pediatric craniofacial plastic surgeon has written that Dr. Toranto is "competent, professional and exceedingly well trained". This surgeon elaborated further stating that he had "operated extensively with Dr. Toranto" and that Dr. Toranto performed "superbly" on cases at the "the highest level of complexity in

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

craniofacial and pediatric plastic surgery… [and that Dr. Toranto]
excelled at the preparation, surgical execution and management of
those patients."

e.  A leading surgeon at UCI has written that Dr. Toranto is "superb" and
"truly was one of the best Plastic Surgeons [UCI has] ever had," that he
is "the true model of able, available and affable" and that he would be
"an amazing asset to [Rady]."

f.  Another surgeon at UCI has called Dr. Toranto "technically one of the
best plastic surgeons [she has ever] worked with," described his results
as "exceptional, cosmetically and functionally," and described his
bedside manner as being "without reproach."

g.  An oral and maxillofacial surgeon who operated with Dr. Toranto has
written that Dr. Toranto is "an excellent pediatric plastic and
craniofacial plastic surgeon" and that operating with him "was a
pleasure not only because of his superior clinical talent but also because
of his affable demeanor."

h.  The Chair of the Credentials Committee at CHOC describes Dr.
Toranto as "an excellent surgeon" who provides "prompt and caring
service," who has been "praised by families in regard to his skill and
bedside manner," and whose record from a credentialing point of view
is "stellar."

i.  CHOC's Chief of Neonatology praised Dr. Toranto as a "meticulous"
and "excellent surgeon" who "excels as both a team player and
program builder."

j.  CHOC's Chief of Neurosurgery who is also the head of pediatric
neurosurgery at UCI described Dr. Toranto as a "consummate
professional" who was "adored by his patients."

k.  CHOC's Pediatrician in Chief praised Dr. Toranto for "his surgical

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

talent, his skills in program development and collaboration, and his overall stewardship on behalf of CHOC Children's Hospital," and as "a positive example of how to build teams and programs at a children's hospital."

50.    Ironically, the day before Dr. Toranto tendered his resignation to UCI (as more particularly described below), Dr. Toranto was recommended for promotion at UCI.  The departmental recommendation described Dr. Toranto as having "established himself as an excellent craniofacial pediatric surgeon… [who] brought a new dimension for orthognathic surgery to [CHOC]."  The recommendation further described Dr. Toranto as "an excellent teacher" and complimented his research and service to UCI.

51.    Dr. Toranto is a member of the American College of Surgeons, making him a member of the largest and arguably most prestigious organization of surgeons in the world.  As described by the American College of Surgeons, being a Fellow in the College means "that the surgeon's education, training, professional qualifications, surgical competence, and ethical conduct have passed a rigorous evaluation, and have been found to be consistent with the high standards established and demanded by the College."

*1994 to 2013 – Prior to Orange County*

52.    Dr. Toranto earned his undergraduate degree from Stanford University in 1999.

53.    In 2001, while pursuing his medical degree, Dr. Toranto received the University of Michigan International Institute Award for Latin American and Caribbean Studies, which award funded his work in Buenos Aires, Argentina at Hospital de Clinicas serving the needs of Latin American patients.

54.    In 2004, while pursuing his medical degree, Dr. Toranto received a second award – the University of Michigan Global REACH International Studies Award – which funded his work in Buenos Aires, Argentina helping Hispanic children with

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1    cancer in Hospital Italiano's pediatric oncology ward.

2        55.   Dr. Toranto graduated in 2004 from the University of Michigan, where he

3    obtained his medical degree.

4        56.   Dr. Toranto completed his general surgery residency in 2009 at the

5    University of Alabama at Birmingham.  He is a Board Certified general surgeon.

6        57.   Dr. Toranto travelled to Jamshedpur, India with Operation Smile as a

7    Regan Fellow, where he performed craniofacial plastic surgeries (cleft lip and cleft

8    palate repairs) for indigent patients with no other access to such care.

9        58.   Dr. Toranto completed his plastic surgery residency in 2012 at Duke

10   University.

11       59.   Dr. Toranto completed a craniofacial fellowship in 2013 at the University

12   of Southern California and Children's Hospital of Los Angeles.  He is a Board

13   Certified plastic and reconstructive surgeon with a specialty in craniofacial plastic

14   surgery and complex pediatric craniofacial plastic surgery, in particular.

15                          *2013-2015: Orange County*

16       60.   Between October 2013 and October 2015, Dr. Toranto lived and worked

17   in Orange County, California.

18       61.   In 2013, following the completion of his craniofacial fellowship in Los

19   Angeles, Dr. Toranto took a position as an Assistant Professor at UCI and joined

20   the medical staff of UCI Medical Center.

21       62.   In 2013, through UCI's relationship with CHOC, Dr. Toranto joined the

22   medical staff of CHOC, specifically to practice craniofacial and pediatric plastic

23   surgery.

24       63.   At UCI, Dr. Toranto was junior to Dr. Jaffurs, who, like Dr. Toranto, is a

25   pediatric plastic and craniofacial surgeon.  While UCI had a number of plastic

26   surgeons on its medical staff, Dr. Toranto and Dr. Jaffurs were the only two

27   surgeons who specialized in pediatric craniofacial plastic surgery.

28       64.   In 2013 when Dr. Toranto joined the medical staff at CHOC, and at all

1   times while Dr. Toranto lived and worked in Orange County, Dr. Jaffurs was the
2   chief of plastic surgery at CHOC, and was therefore administratively over Dr.
3   Toranto.

4       65.    As a professional and a new arrival at UCI and CHOC, Dr. Toranto
5   initially worked hard to cultivate a good working relationship with Dr. Jaffurs.

6       66.    However, soon after Dr. Toranto began at UCI, Dr. Jaffurs asked Dr.
7   Toranto to help attack and discredit another pediatric craniofacial plastic surgeon
8   ("Physician No. 1").

9       a.   On information and belief, some time prior to Dr. Toranto's arrival at
10          UCI and CHOC, Dr. Jaffurs sought to damage the career of Physician
11          No. 1, whom Dr. Jaffurs saw as a competitor.

12      b.   Physician No. 1 is skilled at performing a particularly complex pediatric
13          craniofacial plastic surgery procedure called neonatal mandibular
14          distraction osteogenesis ("MDO" or "distraction").  Neonatal MDO is
15          a procedure involving the installation of a device into a newborn's jaw,
16          which device is used to grow and reshape the jaw.  Newborns and
17          infants who are candidates for MDO suffer from clinically important
18          and dangerous airway obstructions.  Often this problem is diagnosed at
19          birth, and these babies are taken directly to the Neonatal Intensive Care
20          Unit ("NICU").

21      c.   On information and belief, as part of Dr. Jaffurs' attack on Physician
22          No. 1, Dr. Jaffurs sought to perform an MDO procedure himself in
23          order to prevent Physician No. 1 from performing it, and to
24          demonstrate a lack of any need for the services of Physician No. 1.

25      d.   On information and belief, Dr. Jaffurs did not know how to properly
26          place the MDO distraction device, severely injured the baby, and as a
27          result is now prohibited from performing MDOs at CHOC.  This left
28          Physician No. 1 as the only physician at CHOC who could perform

MDOs.

e.  Dr. Toranto is an expert in MDOs, and when he joined UCI and CHOC, Dr. Jaffurs saw an opportunity to continue his efforts to discredit and undermine the career of Physician No. 1 by using Dr. Toranto.

f.  Within weeks of Dr. Toranto's arrival at CHOC and while en route to a meeting with a CHOC hospital administrator, Dr. Jaffurs told Dr. Toranto that "this is going to be great," because Dr. Toranto will be able to help him (Dr. Jaffurs) "stick it to [Physician No. 1]."  At that meeting, Dr. Jaffurs assailed Physician No. 1 to the hospital administrator.

g.  Though Dr. Toranto was new to the hospital, and desired a good working relationship with Dr. Jaffurs, Dr. Toranto refused to help Dr. Jaffurs discredit Physician No. 1, for Dr. Toranto perceived no wrongdoing on the part of Physician No. 1, and Dr. Toranto considered Dr. Jaffurs' behavior to be unethical and completely unprofessional.

h.  Dr. Toranto met with the Chief of the NICU at a later date to discuss MDO, and the subject of Physician No. 1 was raised by the Chief of the NICU.  Dr. Toranto stated that he would be pleased to work with Physician No. 1 and that, in fact, the inclusion of Physician No. 1 in the MDO team would make the team stronger.

i.  Some months later, Dr. Jaffurs asked Dr. Toranto to help compile information that he (Dr. Jaffurs) could use to undermine Physician No. 1's ability to care for patients at CHOC.

j.  Dr. Toranto refused to collude with Dr. Jaffurs.

67.  In a separate incident, Dr. Toranto received a letter from the medical staff office at CHOC regarding medical staff privileges for another pediatric craniofacial

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1   plastic surgeon ("Physician No. 2").  The letter stated that concerns had been raised

2   about Physician No. 2, which, if substantiated, would result in the revocation of

3   Physician No. 2's privileges for performing certain pediatric craniofacial plastic

4   surgery procedures at CHOC.  The letter asked Dr. Toranto whether he (Dr.

5   Toranto) would substantiate those concerns.

6       a.  Dr. Toranto asked Dr. Jaffurs about the letter, and Dr. Jaffurs admitted

7          that he (Dr. Jaffurs) caused the letter to be issued.  Specifically, Dr.

8          Jaffurs informed Dr. Toranto that he (Dr. Jaffurs) had gone to the

9          medical staff office at CHOC to find out how to remove clinical

10         privileges from a division member.  He found out that if the chief filled

11         out paperwork and this was authenticated by another surgeon in the

12         division, the surgeon in question would be stripped of his/her

13         privileges.  Dr. Jaffurs filled out the paperwork in his role as the chief,

14         which generated the letter that was sent to Dr. Toranto.

15      b.  Dr. Jaffurs instructed Dr. Toranto to sign the letter.

16      c.  Dr. Toranto asked Dr. Jaffurs if he (Dr. Jaffurs) had ever spoken with

17         Physician No. 2 about whatever concerns he (Dr. Jaffurs) had.  Dr.

18         Jaffurs said he had not, but again instructed Dr. Toranto to sign the

19         letter.

20      d.  Dr. Toranto refused.

21      e.  Dr. Toranto also informed the chairman of the Department of Plastic

22         Surgery at UCI, Dr. Greg Evans ("Dr. Evans").  Specifically, Dr.

23         Toranto told Dr. Evans that Dr. Jaffurs was attacking Physician No. 2,

24         that Dr. Jaffurs was attempting to coerce Dr. Toranto to aid in those

25         attacks, that Dr. Jaffurs' attacks were unethical and highly

26         unprofessional, that Physician No. 2 was a senior member of the

27         division of plastic surgery at CHOC who had served the children of

28         Orange County for decades, and that Dr. Toranto would not be a party

1    to such attacks.

2    68.    Following these incidents, and after learning about similar incidents in the

3    past, Dr. Toranto came to understand that Dr. Jaffurs has a routine pattern and

4    practice of leveling baseless attacks against surgeons whom Dr. Jaffurs perceives as a

5    competitive threat—Dr. Jaffurs described this pattern in writing as "weeding the

6    garden"—and has a history of devious and confrontational behavior.

7        a.    On information and belief, Dr. Jaffurs was asked to leave Miller

8            Children's Hospital after engaging in similar baseless efforts to discredit

9            a pediatric plastic surgeon there ("Physician No. 3").  Physician No. 3,

10           the target of Dr. Jaffurs' attacks, was the chief of the plastic surgery

11           division at Miller Children's Hospital.

12       b.    On information and belief, Dr. Jaffurs failed his initial oral examination

13           for the American Board of Plastic Surgery because, during the exam,

14           Dr. Jaffurs demonstrated physically confrontational behavior toward

15           his examiner ("Physician No. 4").

16   69.    Once Dr. Toranto made clear that he would not be Dr. Jaffurs' accomplice

17   in prosecuting Dr. Jaffurs' personal vendettas, Dr. Jaffurs developed a deep-seated

18   personal animosity towards Dr. Toranto.

19   70.    Dr. Jaffurs' personal animosity created a hostile and unwelcoming work

20   environment for Dr. Toranto.

21       a.    Dr. Jaffurs' behavior included yelling at Dr. Toranto and refusing to

22           acknowledge him.

23       b.    Dr. Jaffurs' behavior was witnessed by other physicians, including Dr.

24           Evans, when Dr. Jaffurs yelled at Dr. Toranto during internal meetings.

25       c.    Dr. Jaffurs used his seniority over Dr. Toranto to instruct surgery

26           schedulers to assign to Dr. Toranto patients that Dr. Jaffurs did not

27           want to see.  Dr. Jaffurs did this without consulting with Dr. Toranto.

28       d.    At CHOC's behest, or with CHOC's approval, Dr. Jaffurs instructed

- 22 -                      Second Amended Complaint
                           *Toranto v. Jaffurs, et al.*

1    Dr. Toranto take significant additional call without compensation, and
2    threatened him if he disagreed.

3       e.  In May 2015, Dr. Jaffurs sent an email to several physicians (including
4    Dr. Toranto and Dr. Evans) suggesting that another physician
5    ("Physician No. 5") was allowed to go on sabbatical only because
6    Physician No. 5 is Jewish.  In the email, Dr. Jaffurs asked Dr. Toranto
7    to confirm that only Jewish physicians are permitted sabbaticals.  Dr.
8    Toranto found Dr. Jaffurs' email to be anti-Semitic, unprofessional,
9    and in poor taste.  Dr. Toranto, Physician No. 4 and Physician No. 5
10   are all Jewish.  Dr. Jaffurs is not.

11      71.  No longer willing to suffer the hostile work environment created by Dr.

12   Jaffurs, but not wanting to uproot his practice, Dr. Toranto tendered his resignation

13   with UCI and sought employment with the CHOC Foundation.  (Because of the

14   affiliation between UCI and CHOC, it was necessary for Dr. Toranto to resign from

15   UCI before proceeding with the CHOC Foundation to avoid the appearance of

16   "employee poaching" by a CHOC-related entity.)  With the CHOC Foundation, Dr.

17   Toranto had the opportunity to continue his practice at CHOC and UCI without

18   being subordinate to Dr. Jaffurs at either UCI or CHOC.

19      72.  Dr. Toranto tendered his resignation to UCI on July 2, 2015.

20      73.  Immediately, Dr. Jaffurs commenced an outrageous and vicious campaign

21   against Dr. Toranto in order to injure Dr. Toranto and prevent his employment at

22   the CHOC Foundation.  Indeed, discovery in this case has shown ████████████

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████

26   ████████████████████████████████████████████████████████████

27   ██████████████████████████████████████████████████████████████████

28   ██████████████████████████████████████████████████████

- 23 -

Second Amended Complaint
*Toranto v. Jaffurs, et al.*



22   b.   In the presence of Dr. Toranto, Dr. Jaffurs told several physicians,

23        including the president of the CHOC Foundation, that Dr. Toranto

24        refused to accept Hispanic and low-income patients.  Dr. Jaffurs knew

25        these statements were false.  In fact, Dr. Toranto, who speaks fluent

26        Spanish and who received awards supporting his work in Latin

27        American hospitals, caters to the Hispanic community.  In addition,

28        Dr. Toranto served a considerably higher percentage of low-income

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1    patients than the departmental average at UCI.

2        c.  Dr. Jaffurs also taunted Dr. Toranto with hostile emails, including job

3           fair emails implying that Dr. Toranto should seek employment

4           elsewhere.

5        d.  Dr. Jaffurs improperly attempted to prohibit Dr. Toranto from

6           continuing to see patients at CHOC outpatient clinics.

7        e.  Dr. Jaffurs, who previously almost never entered the operating room

8           while Dr. Toranto was performing surgeries, began interrupting his

9           cases, even entering the operating room multiple times during a single

10          procedure—notably when a child's skull was being reconstructed, and

11          during the point in the procedure when the child's skull had been

12          removed and brain was exposed—to harass Dr. Toranto.

13   74.  The CHOC Foundation did not hire Dr. Toranto.

14   75.  Dr. Jaffurs wrote to Dr. Toranto, "I am assuming that by now the Choc

15   (*sic*) Foundation has informed you that you will not be hired.  This was done at my

16   request."

17   76.  Dr. Jaffurs' conduct described throughout this complaint violated not only

18   the law and Dr. Toranto's rights, but also the medical staff bylaws of both UCI and

19   CHOC.

20   *2015-Present: San Diego*

21   77.  In 2015, though Dr. Toranto wanted to remain in Orange County and join

22   the CHOC Foundation for the reasons described above, Dr. Toranto began to

23   contemplate moving to San Diego.  First and foremost, Dr. Toranto was considering

24   this move because he could no longer bear working with Dr. Jaffurs and wanted to

25   avoid a formal dispute or litigation.  Second, Dr. Toranto has family in San Diego,

26   and wished to be closer to them.

27   78.  Dr. Toranto began exploring opportunities in San Diego by reaching out to

28   professional contacts in the community.  He learned that Rady Children's in San

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1   Diego had a need for a surgeon with his particular expertise.  Dr. Toranto was

2   informed that Rady Children's had two pediatric craniofacial plastic surgeons—

3   defendant Dr. Gosman and Dr. Steven Cohen (who is not a defendant).  Dr. Cohen

4   was about to retire and did retire from performing surgeries at Rady in 2015.

5   Moreover, Dr. Toranto was informed that the Rady Children's plastic surgery

6   department had one of the longest and worst wait times of all departments at the

7   hospital, which wait times were expected to increase upon Dr. Cohen's retirement.

8       79.   Dr. Toranto gave notice of his resignation to UCI on July 2, 2015, as

9   aforesaid.

10      80.   Shortly thereafter, Dr. Toranto attempted to contact defendant Dr.

11  Gosman to discuss his interest in potentially relocating to San Diego.  Dr. Toranto

12  first tried to contact her by telephone, but he received no reply.  Then, Dr. Toranto

13  reached out to Dr. Gosman by email.  In response, Dr. Gosman made clear that she

14  did not want any other pediatric craniofacial plastic surgeon on staff at Rady, writing

15  to Dr. Toranto that "we have more than enough craniofacial coverage at

16  Rady/UCSD and are not looking for anyone at this time."

17      81.   Dr. Toranto also reached out to other professional contacts in San Diego,

18  seeking advice about the city and the market for his services.  A number of these

19  physicians referred Dr. Toranto again to Dr. Gosman (perhaps not realizing that Dr.

20  Toranto had independently reached out to Dr. Gosman), and in response, Dr.

21  Gosman reiterated to Dr. Toranto that Rady Children's did not have a place for Dr.

22  Toranto.

23      82.   Dr. Toranto moved to San Diego in October 2015.

24      _Dr. Toranto's Application to Rady Children's, and Rady Children's Sham Peer Review_

25      83.   Under the Rady Children's Medical Staff Bylaws, application materials are

26  submitted to and compiled by the "medical staff services department."  Only when

27  the medical staff services department has a complete application, and has verified all

28  information contained within the application, does the medical staff services

Second Amended Complaint
                                                      _Toranto v. Jaffurs, et al._

1   department then circulate the application to each section in which the applicant

2   seeks privileges to begin the peer review process.

3       84.   Dr. Toranto began submitting application materials to the Rady Children's

4   medical staff services department in July 2015, but his application for privileges was

5   not completed until late October 2015.  Thus, according to the Rady Children's

6   Medical Staff Bylaws, Dr. Toranto's application materials should not have been

7   circulated to the Plastic Surgery section until late October 2015.

8       85.   In July 2015, however, before Dr. Toranto's completed application was

9   submitted to Rady Children's, Dr. Jaffurs had already learned that Dr. Toranto was

10  applying for privileges at Rady Children's and spoke with Dr. Gosman about Dr.

11  Toranto.  On information and belief, Drs. Jaffurs and Gosman conspired at that

12  time to prevent Dr. Toranto from obtaining privileges at Rady Children's.

13      86.   In furtherance of the conspiracy between Drs. Jaffurs and Gosman, Dr.

14  Jaffurs made defamatory statements to Rady Children's, intending to professionally

15  harm Dr. Toranto, to prevent Dr. Toranto from obtaining employment as a

16  pediatric craniofacial plastic surgeon, and to prevent Dr. Toranto from obtaining

17  privileges at Rady Children's.  Dr. Jaffurs outrageously said that Dr. Toranto "should

18  not operate on children," meaning that he was so unfit and incompetent that he

19  could not be trusted to perform in his chosen profession, for which he is

20  unquestionably qualified and had trained and practiced for sixteen years.  All of these

21  defamatory statements were untrue, were known by Dr. Jaffurs to be untrue, and

22  were made by Dr. Jaffurs out of hatred, ill-will, spite, malice, and anti-competitive

23  animus.

24      87.   Dr. Jaffurs and Dr. Gosman conspired to spread false information about

25  Dr. Toranto to various physicians, including physicians at UCSD and members of

26  the Rady Children's Medical Staff, with the intent of harming Dr. Toranto,

27  preventing him from obtaining employment as a pediatric craniofacial plastic

28  surgeon, and preventing him from receiving fair consideration of his application for

1   privileges at Rady Children's.

2       88.    Dr. Gosman used her influence as the chief of the plastic surgery

3   department at Rady, as an employee of the Rady Joint Employers, and as a member

4   of the Rady Children's Medical Staff to prevent Dr. Toranto from receiving fair

5   consideration of his application, and to preserve her position as the sole pediatric

6   craniofacial plastic surgeon at Rady Children's.

7       89.    Rady Children's, Rady Children's Medical Staff, and the Rady Foundation

8   combined and conspired with their co-defendants to prevent Dr. Toranto from

9   obtaining privileges at Rady Children's.  Rady Children's, Rady Children's Medical

10  Staff, and the Rady Foundation are closely affiliated entities based at the same

11  location.  While they are separate entities, on information and belief, their interests

12  are at all times aligned.  The Rady Joint Employers employ the vast majority of

13  physicians who practice at Rady Children's, including Dr. Gosman.  Because Dr.

14  Toranto is not employed by the Rady Joint Employers, any revenue Dr. Toranto

15  would generate from procedures he performed at Rady Children's would be diverted

16  from Dr. Gosman, and as a result, from the Rady Joint Employers.  The Rady

17  Foundation, Rady Children's, and the Rady Children's Medical Staff are therefore

18  economically motivated to conspire to deny Dr. Toranto procedurally fair

19  consideration of his application for admitting privileges at Rady Children's, and

20  access to the market for his services.

21      90.    Indeed, discovery in this case has shown that ██████████████████

22  █████████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  █████████████████████████████████████████████████████████████

28  ██████████████████████████████████████████████████

Second Amended Complaint
                                        *Toranto v. Jaffurs, et al.*



Second Amended Complaint
*Toranto v. Jaffurs, et al.*



Second Amended Complaint
*Toranto v. Jaffurs, et al.*

95.    On January 6, 2016, Dr. Toranto received a call from Dr. Carvalho, who informed Dr. Toranto that his application for privileges at Rady Children's would be presumptively denied.  Dr. Carvalho then threatened Dr. Toranto, telling him that he would be presumptively reported to the California Medical Board if he did not withdraw his application.

96.    Dr. Toranto was stunned, not only because he is a highly qualified and eminently credentialed surgeon with a blemish-free professional record, but because to this point, Dr. Toranto had not received a single interview or hearing at Rady or been given any notice that there was any problem with his application.  When Dr. Toranto asked Dr. Carvalho about the basis for Rady's premature determination, she stated only and vaguely that it was due to concerns over "references."

97.    Between the January 6, 2016 call and February 2016, Dr. Toranto requested on multiple occasions that Rady Children's provide him with information as to the basis for its determination and give him an opportunity to be heard.  Rady did not grant an interview and stated only vaguely and misleadingly that Rady's concerns were "behavioral."

98.    ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

99.    On February 3, 2016, Dr.  Carvalho emailed Dr. Toranto and stated, "During our conversation on 01/6/16 we requested that you contact us to let us

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1  know if you would like to continue or withdraw your application to our medical

2  staff."  Later that day, Dr. Toranto replied to Dr. Carvalho to inform her and Rady

3  Children's that he would not withdraw his application.

4        100.



Second Amended Complaint
*Toranto v. Jaffurs, et al.*



Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1  ████████████████████████████████████████
2  ███████████
3  ████████████████████████████████████████████
4  ████████████████████████████████
5  ██████████████████████████████████████
6  █████████████████

7  102.  On March 21, 2016, Dr. Toranto delivered a package of supplemental

8  information to Rady in support of his application.  This supplement included

9  background on Dr. Jaffurs' personal animosity towards Dr. Toranto; attached

10  evidence that Dr. Toranto had met or exceeded all performance criteria at CHOC

11  and UCI at all times he was on the active medical staff there; attached his

12  departmental recommendation for promotion from the day before Dr. Toranto

13  tendered his resignation at UCI; and also attached eleven unqualified letters of

14  support from physicians, administrators and staff members at CHOC and UCI,

15  including (i) the CEO of CHOC, (ii) CHOC's Chief of Neonatology and Director of

16  the NICU, (iii) CHOC's Pediatrician-in-Chief, (iv) CHOC's Chief of Neurosurgery,

17  (v) the head of CHOC's Credentialing Committee, (vi) the Director of UCI's

18  Melanoma Center, and (vii) two plastic and reconstructive surgeons at UCI.

19  103.  Four of the letters of support included in that supplement directly

20  addressed the allegations made by Dr. Jaffurs about Dr. Toranto, accurately

21  describing Dr. Jaffurs' allegations as "entirely unacceptable," "clearly false,"

22  "completely unprofessional," a "personal vendetta," and "[having] no basis in fact."

23  104.  ██████████████████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████████████████

26  ██████████████████████████

27  105.  On July 22, 2016, Dr. Toranto delivered another package of supplemental

28  information to Rady in support of his application.  This supplement included five

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1     additional unqualified letters of recommendation from physicians including (i) two

2     leading pediatric plastic and craniofacial surgeons, (ii) CHOC's Chief of

3     Neurosurgery, (iii) an oral and maxillofacial surgeon, and (iv) a plastic and

4     reconstructive surgeon at UCI.

5         106.  One of the additional unqualified letters of recommendation submitted on

6     July 22, 2016 directly addressed the allegations made by Dr. Jaffurs about Dr.

7     Toranto, accurately stating that Dr. Jaffurs had made "false and highly negative

8     statements" about Dr. Toranto directly to Rady Children's, that Dr. Jaffurs had

9     "personal animus towards Dr. Toranto," and that Dr Jaffurs' statements to Rady

10     Children's were "made to prevent Dr. Toranto from being privileged or being

11     employed as a pediatric plastic and craniofacial surgeon."

12         107.  On November 28, 2016, more than one year after Dr. Toranto submitted

13     his completed application for privileges and after the involvement of this Court,

14     Rady Children's finally conducted its *first and only* interview with Dr. Toranto. At that

15     interview, Rady Children's informed Dr. Toranto that it would be undertaking a

16     review of his cases.

17         108.  *Four months later*, on March 26, 2017, Dr. Carvalho emailed Dr. Toranto to

18     inform him that his application was expected to go before the Rady Credentials

19     Committee "at its April 13 meeting."  Dr. Carvalho further advised that Rady was in

20     the process of engaging an independent reviewer to examine Dr. Toranto's cases,

21     thereby indicating that Rady Children's had yet to even start the review.  Dr. Toranto

22     asked to be involved in the selection of the reviewer and to have the opportunity to

23     speak to the reviewer before any report was issued, and reiterated his request on

24     multiple occasions.  Dr. Toranto's requests were rebuffed.

25         109.  *Six months after that*, on September 14, 2017, Mary Davis, Rady's medical

26     staff coordinator, emailed Dr. Toranto to inform him that, "we are preparing your

27     file for Credentials Committee review and recommendation this week."

28

110.  Five days later, on September 19, 2017, Rady responded to Dr. Toranto's requests for an update on the status of the independent review undertaken on his cases.  In an email on September 19, 2016, Rady Children's represented to Dr. Toranto that, "The cases were not pre-reviewed or selected by Rady Children's or CHOC prior to being sent to the expert, and there was no outcome-based criteria used to determine which cases would be reviewed."

111.  Then, *four months after that*, on January 5, 2018, Mary Davis again emailed Dr. Toranto to inform him that, "we are preparing your file for Credentials Committee review and recommendation for next week."

112. ████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████  █████████████████████
████████████████████████████████████████
█████████████████████████████  █████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

113.  On February 7, 2018, approximately **<u>840 days</u>** after he submitted his completed application for privileges to Rady, Dr. Toranto was informed in an email that his application was granted.

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

1    114.  However, the monopolist has many anticompetitive tools in its toolkit and

2    Rady Children's illegal restraint of trade is continuing unabated notwithstanding the

3    grant of privileges.

4                          *2015 to Present: Orange County*

5    115.  In about October 2015, Dr. Toranto took a one-year leave of absence from

6    CHOC when he moved to San Diego.

7    116.  By July 2016, Dr. Toranto had become aware of certain of the unlawful

8    conduct at issue in this case.  With his name, livelihood and career under siege by the

9    Defendants, Dr. Toranto felt he had no choice but to file this lawsuit.

10   117.  By October 2016, Dr. Toranto's leave of absence at CHOC was about to

11   expire, and with no end in sight to the sham review at Rady Children's, Dr. Toranto

12   felt that he needed to reactivate his privileges at CHOC.  Though CHOC was in

13   another city, it was the only other children's hospital at which he had privileges.

14   Unfortunately, Dr. Jaffurs was at CHOC and Dr. Toranto knew that Dr. Jaffurs

15   would attempt to sabotage the reactivation of Dr. Toranto's privileges.  Indeed, that

16   is exactly what happened.

17   118.  ████████████████████████████████████████████

18   █████████████████████████████████████████████

19   █████████████████████████████████████████████

20   ████████████████████████████████████████████

21   █████████████

22   119.  Additionally, Dr. Jaffurs engaged in wrongful conduct by threatening and

23   intimidating other physicians at CHOC to coerce them into not providing support

24   for Dr. Toranto's application.  For example, one aspect of Dr. Toranto's application

25   required him to identify a physician who would provide "call coverage" for him.

26   Two surgeons told Dr. Toranto that they would provide call coverage.  However,

27   each of those surgeons withdrew following intimidation by Dr. Jaffurs.

28   120.  CHOC eventually overrode Dr. Jaffurs' unlawful efforts and forced his

1    recusal from the evaluation of Dr. Toranto's application, after which Dr. Toranto's

2    application was approved.

3        121.  However, Dr. Jaffurs' interference and unlawful conduct at CHOC is

4    ongoing.  For example, on information and belief, Dr. Jaffurs yelled at a CHOC

5    physician ("Physician No. 6") because Physician No. 6 provided statements in

6    support of Dr. Toranto in connection with this case and threatened Physician No. 6

7    with retaliation for support of Dr. Toranto in connection with this case.  Physician

8    No. 6 advised Dr. Toranto that Physician No. 6, along with certain other physicians

9    who would otherwise operate with Dr. Toranto, could not do so due to fear of

10   retaliation from Dr. Jaffurs.

11       122.   Dr. Jaffurs' unlawful conduct continues unabated.

12                              **First Claim for Relief**

13               **(Conspiracy in Restraint of Trade, 15 U.S.C. § 1)**

14                            **(Against all Defendants)**

15       123.  Dr. Toranto hereby incorporates the paragraphs above, each as though

16   fully set forth herein.

17       124.  Beginning in July 2015 and continuing through the present, Dr. Jaffurs and

18   Dr. Gosman have conspired to prevent Dr. Toranto from obtaining privileges as a

19   pediatric craniofacial plastic surgeon at Rady Children's (and therefore prevent Dr.

20   Toranto from obtaining employment in his specialty in San Diego and Imperial

21   Counties).  Dr. Jaffurs has been acting on feelings of personal and anti-competitive

22   animus, while Dr. Gosman has been motivated by her desire to suppress

23   competition in her local market to her professional and economic benefit.

24       125.  On information and belief, the Rady Joint Employers agreed to support

25   their employee, Dr. Gosman, in her anti-competitive efforts because revenue that

26   Dr. Gosman would otherwise generate for the Rady Joint Employers would be

27   diverted in significant part if Dr. Toranto (who is not an employee of the Rady Joint

28

*Second Amended Complaint*
                                         *Toranto v. Jaffurs, et al.*

1    Employers) were granted privileges at Rady Children's and began serving patients

2    who would otherwise have no choice but to see Dr. Gosman.

3        126.  On information and belief, Dr. Gosman has used her influence and power

4    within Rady Children's, Rady Children's Medical Staff, and the Rady Joint

5    Employers to convince Rady Children's, the Rady Children's Medical Staff and the

6    Rady Joint Employers to support her in her anti-competitive efforts.  Rady

7    Children's, Rady Children's Medical Staff, and the Rady Joint Employers have in fact

8    supported Dr. Gosman in her anti-competitive efforts by: (i) presumptively denying

9    in January 2016 Dr. Toranto's application for privileges at Rady Children's in

10   violation of law and Dr. Toranto's rights; (ii) attempting in January 2016 to coerce

11   Dr. Toranto into withdrawing his application; (iii) refusing to grant Dr. Toranto's

12   repeated requests for an interview; (iv) refusing to otherwise provide Dr. Toranto

13   and his application the procedurally fair consideration required under the Rady

14   Children's Medical Staff bylaws and applicable law; (v) soliciting false and

15   defamatory statements about Dr. Toranto from Dr. Jaffurs and others; and

16   (vi) engaging in other unlawful anti-competitive conduct, even after Dr. Toranto's

17   privileges at Rady Children's were granted, to deny Dr. Toranto access to the market

18   for his services, to his detriment and the detriment of patients.

19       127.  Dr. Gosman, the Rady Defendants, and Dr. Jaffurs, in violation of Section

20   1 of the Sherman Act, 15 U.S.C. § 1, combined and conspired with one another to

21   deny Dr. Toranto procedurally fair consideration of his application for privileges at

22   Rady Children's, and to deny Dr. Toranto entry into the market for pediatric

23   craniofacial plastic surgery services in San Diego and Imperial Counties.

24       128.  As a result of the combination and conspiracy, trade has been restrained, as

25   the public has been deprived of free and open competition in pediatric craniofacial

26   plastic surgery services at Rady Children's and in San Diego and Imperial Counties,

27   where Rady Children's is the only hospital where the practice is available.

28

129.  This combination and conspiracy has also resulted in longer patient wait times, and on information and belief, longer post-operative patient hospital stays and higher payer costs, all of which could be reduced if Dr. Toranto were not illegally restrained from engaging in his trade.  Among other things, Dr. Toranto's particular and exceptional skills and techniques as a pediatric craniofacial plastic surgeon potentially could, on information and belief: (i) reduce the post-operative length of a baby's hospital stay for certain highly complex craniofacial procedures by as much as 60% (from an average of 70 days to an average of 28 days, as Dr. Toranto has achieved elsewhere), and (ii) dramatically reduce medical costs as a result of so reducing post-operative hospital stays (an estimated savings of hundreds of thousands of dollars for each seriously disabled baby and his or her family).

130.  Defendants' combination and conspiracy has also prevented certain highly complex pediatric craniofacial plastic surgery procedures from being available at all to the children of San Diego and Imperial Counties, as Dr. Toranto is an expert in certain procedures that Dr. Gosman, on information and belief, does not perform.

131.  CHOC and CHOC Medical Staff are each liable to plaintiff for the actions of its agent, Dr. Jaffurs, under the theory of agency.

132.  Dr. Toranto has suffered, is suffering, and will continue to suffer, extensive harm to his professional reputation and goodwill.

133.  Dr. Toranto has suffered, is suffering, and will continue to suffer, damages cognizable under Section 1 of the Sherman Act, as he has been restrained from entering the San Diego and Imperial County markets for his professional specialty and trade, developed over sixteen years of training and practice.

134.  Dr. Toranto is entitled to recover threefold the damages he has sustained.

135.  Dr. Toranto is entitled to recover the cost of this suit, including attorney's fees.

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

**Second Claim for Relief**

**(Monopoly - 15 U.S.C. § 2)**

**(Against Defendants Dr. Gosman, Rady Children's, Rady Foundation, &**

**Rady Children's Medical Staff)**

136. Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

137. Defendant Rady Children's is the only hospital serving San Diego and Imperial Counties that offers pediatric plastic and craniofacial surgery medical services. Rady Children's therefore has a monopoly on pediatric plastic and craniofacial surgery in San Diego and Imperial Counties.

138. Rady Children's, the Rady Children's Medical Staff, and the Rady Foundation are partner entities based at the same location. While they are separate entities, on information and belief, their interests are at all times aligned. Rady Children's and the Rady Foundation are also affiliates of UCSD. The majority of physicians with privileges at Rady Children's are employed by the Rady Joint Employers. On information and belief, Rady Children's, Rady Medical Staff, and the Rady Joint Employers endeavor to exclude from Rady Children's any physicians who are not employed by the Rady Joint Employers. To that end, Rady Children's, Rady Medical Staff, and the Rady Joint Employers have a pattern and practice of aggressively discouraging physicians who are not employed by the Rady Joint Employers from applying for privileges at Rady Children's, coercing applicants into withdrawing their applications (as they attempted to do here), or engaging in other anti-competitive conduct.

139. Dr. Toranto is not an employee of the Rady Joint Employers. Rady Children's presumptively denied Dr. Toranto privileges without giving his application procedurally fair consideration, and without a single interview. On information and belief, this action was motivated by Rady Children's, Rady

Second Amended Complaint

*Toranto v. Jaffurs, et al.*

1   Children's Medical Staff's, and the Rady Foundation's desire to exclude Dr. Toranto

2   from Rady Children's because he is not employed by the Rady Joint Employers.

3      140.  Rady Children's has improperly used its monopoly over pediatric plastic

4   and craniofacial surgery services in San Diego and Imperial Counties to exclude Dr.

5   Toranto from the market for those services, in violation of Section 2 of the Sherman

6   Act, 15 U.S.C. § 2.

7      141.  Dr. Gosman, the Rady Joint Employers, and the Rady Children's Medical

8   Staff have combined and conspired with Rady Children's in its anticompetitive

9   conduct to deny Dr. Toranto entry into the market for his professional services, in

10  violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

11     142.  At the time this suit was filed, and until February 2018, the sole pediatric

12  plastic and craniofacial surgery practitioners were employees of the Rady Joint

13  Employers, and all revenue generated by the practice flowed to the Rady Joint

14  Employers.  The Rady Joint Employers have supported Rady Children's anti-

15  competitive conduct in order to preserve this exclusive revenue stream, which would

16  otherwise be partially diverted with the entry of Dr. Toranto into the market.

17     143.  Dr. Gosman supported and actively participated in Rady Children's anti-

18  competitive conduct in order to preserve her position as the only pediatric plastic

19  and craniofacial surgeon practicing at Rady Children's, as she has reaped and stands

20  to reap substantial professional and economic benefits as the sole pediatric plastic

21  and craniofacial surgeon practicing in San Diego and Imperial Counties.

22     144.  Influenced by its member, Dr. Gosman, Rady Children's Medical Staff has

23  also supported Rady Children's anti-competitive conduct, and has participated in the

24  sham peer review given to Dr. Toranto's application.

25     145.  Dr. Toranto has suffered, is suffering, and will continue to suffer, extensive

26  harm to his professional reputation and goodwill.

27     146.  Dr. Toranto has suffered, is suffering, and will continue to suffer, damages,

28  as he is unable to be employed in or practice his medical specialty in this district.

147.  Dr. Toranto is entitled to recover threefold the damages he has sustained.

148.  Dr. Toranto is entitled to recover the cost of this suit, including attorney's fees.

**Third Claim for Relief**

**(Bad Faith Professional Review – Cal Bus. & Prof. Code § 809.05 et seq.)**

**(Against Defendants Dr. Gosman, Rady Children's, Rady Foundation, & Rady Children's Medical Staff)**

149.  Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

150.  On information and belief, Dr. Gosman has actively and improperly endeavored to prevent Rady Children's and Rady Children's Medical Staff from giving procedurally fair consideration to Dr. Toranto's application for privileges.

151.  Dr. Gosman, Rady Children's and Rady Children's Medical Staff have performed acts and proceedings to presumptively deny Dr. Toranto's application for privileges at Rady Children's (i) without a reasonable effort to obtain facts, (ii) without the reasonable belief that such acts or proceedings are warranted by the facts, and (iii) with malice.

152.  A reasonable effort to obtain the facts of the matter was not undertaken. Among other things, actions were taken to presumptively deny privileges to Dr. Toranto without even speaking with him or informing him of any concerns.  This is a *per se* violation, as any reasonable effort to obtain the facts of a matter relating to Dr. Toranto requires, at a minimum, asking him about it.

153.  Actions were taken without the reasonable belief that they were warranted by the facts.   As aforesaid, no reasonable effort has been made to obtain the facts, so no reasonable belief could be based on them.  Rather, Dr. Gosman, Rady Children's and Rady Children's Medical Staff have acted in bad faith and for anti-competitive purposes without regard for the facts.

154.  The aforementioned abject failure to provide fair consideration of Dr.

1   Toranto's application is evidence of malice.

2       155.  Though Dr. Toranto's application had been complete for nearly ten

3   months as of the date this suit was filed, Defendants Rady Children's and Rady

4   Children's Medical Staff had as of that time refused to grant Dr. Toranto a single

5   interview or hearing, despite multiple requests.

6       156.  Defendants' actions (and inactions) are arbitrary and capricious, and have

7   been taken in bad faith.

8       157.  Rady Foundation is liable to plaintiff for the actions of its employee, Dr.

9   Gosman, on the basis of *respondeat superior*.

10       158.  Dr. Toranto has suffered, is suffering, and will continue to suffer, extensive

11   harm to his professional reputation and goodwill as a result of defendants' actions

12   (and inactions).

13       159.  Dr. Toranto has suffered, is suffering, and will continue to suffer, damages,

14   as he is unable to engage in his specialty of pediatric craniofacial plastic surgery in

15   this district.

**Fourth Claim for Relief**

**(Retaliation - Cal. Bus. & Prof. Code §§ 510-512, 2056)**

**(Against Defendants Dr. Jaffurs, CHOC & CHOC Medical Staff)**

19       160.  Plaintiff hereby incorporates the paragraphs above, each as though fully set

20   forth herein.

21       161.  When Dr. Toranto was on the active medical staff at UCI and CHOC, Dr.

22   Jaffurs, acting on feelings of personal animus and a desire to suppress competition,

23   attempted to push one physician (Physician No. 1 previously mentioned herein)

24   entirely out of CHOC, and attempted to limit the privileges of another physician

25   (Physician No. 2).

26       162.  Dr. Toranto took steps to protest Dr. Jaffurs' decision and attempts to

27   discredit two competent physicians, in an effort to advocate for medically

28   appropriate health care for patients.

163.  In Dr. Toranto's professional opinion, Dr. Jaffurs' efforts to discredit the two physicians would impair CHOC's ability to provide appropriate health care to its patients.

164.  Defendant Dr. Jaffurs, CHOC and CHOC Medical Staff retaliated against Dr. Toranto by creating a hostile work environment, and by making defamatory and false statements about Dr. Toranto to, among others, CHOC, CHOC Foundation, Rady Children's, Rady Children's Medical Staff, Rady Foundation, UCSD and Dr. Gosman.

165.  Defendant's retaliatory acts have caused Dr. Toranto to suffer extensive harm to his professional reputation and goodwill.  Dr. Toranto has suffered, is suffering, and will continue to suffer, damages, as he is unable to be employed in or practice his specialty in this district.

166.  CHOC and CHOC Medical Staff are each liable to plaintiff for the actions of its agent, Dr. Jaffurs, under a theory of agency.

167.  Defendants acted with malice, oppression, and/or fraud in retaliating against Dr. Toranto, entitling Dr. Toranto to punitive damages.

**Fifth Claim for Relief**

**(Retaliation - Cal. Labor Code § 1102.5)**

**(Against Defendants Dr. Jaffurs, CHOC & CHOC Medical Staff)**

168.  Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

169.  As set forth above, defendant Dr. Jaffurs attempted to persuade Dr. Toranto to join him (Dr. Jaffurs) in making defamatory statements about other physicians at CHOC, and to engage in bad faith professional review of those physicians, in violation of California law.

170.  When Dr. Toranto refused to participate in Dr. Jaffurs' activities, which would have resulted in violation of California statutes and noncompliance with California rules and regulations, Dr. Jaffurs retaliated against Dr. Toranto by creating

a hostile work environment, and by making false and defamatory statements about Dr. Toranto to, among others, CHOC, the CHOC Foundation, CHOC Medical Staff, Rady Children's, Rady Foundation, Rady Children's Medical Staff, UCSD and Dr. Gosman.

171.  Defendants CHOC and CHOC Medical Staff are each liable to plaintiff for the tort of retaliation committed by Dr. Jaffurs, under the theory of agency.

172.  Dr. Toranto has suffered, is suffering, and will continue to suffer, damages as a result of this conduct, including but not limited to constructive termination and an inability to be employed in his specialty in this district.

173.  Defendants acted with malice, oppression, and/or fraud in retaliating against Dr. Toranto, entitling Dr. Toranto to punitive damages.

### Sixth Claim for Relief

### (Defamation – Cal Civ. Code §§ 45-46)

### (Against All Defendants)

174.  Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

*Slander*

175.  Dr. Jaffurs made false oral statements to the CHOC Foundation relating to Dr. Toranto's profession to Dr. Toranto's detriment, which constitute slander per se.  These statements included the false and defamatory charge that Dr. Toranto refused to operate on Hispanic patients, and that Dr. Toranto refused to operate on low income patients.

176.  Dr. Jaffurs made false oral statements to Dr. Gosman relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per se.

177.  Dr. Jaffurs made false oral statements to Rady Children's relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per se.

178.  Dr. Jaffurs made false oral statements to the Rady Foundation relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per

se.

179.  Dr. Jaffurs made false oral statements to UCSD relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per se.

180.  Dr. Jaffurs made false oral statements to the Rady Children's Medical Staff relating to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitute slander per se.

181.  Dr. Gosman, CHOC, CHOC Medical Staff, Rady Children's, Rady Foundation, and Rady Children's Medical Staff forwarded, conveyed, or repeated Dr. Jaffurs' false and defamatory statements about Dr. Toranto to others. Therefore, each defendant is directly liable to plaintiff for the tort of slander per se.

182.  Defendants CHOC and CHOC Medical Staff are liable to plaintiff for the tort of slander per se committed by Dr. Jaffurs under the theory of agency.

*Libel*

183.  As set forth above, specifically paragraphs 73, 86, 90, 92, 98, 100, 101, and 104, Dr. Jaffurs made false written statements about Dr. Toranto to each of his co-defendants, to UCSD and UCI, and to the CHOC Foundation.  These false statements were made in regards to Dr. Toranto's profession, to Dr. Toranto's detriment, which constitutes libel per se.

184.  Dr. Gosman, Rady Children's, Rady Foundation, and Rady Children's Medical Staff forwarded, conveyed, or repeated Dr. Jaffurs' false and defamatory statements about Dr. Toranto to others.  Therefore, each defendant is directly liable to plaintiff for the tort of libel per se.

185.  ███████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████

Second Amended Complaint
*Toranto v. Jaffurs, et al.*



186.

Second Amended Complaint
*Toranto v. Jaffurs, et al.*



188.  Defendants knew the statements to be false, and the evidence available to defendants proved the statements were false.  Defendants Dr. Gosman, Rady Children's, Rady Foundation, and Rady Children's Medical Staff failed to take reasonable care to determine the truth or falsity of the statements, as they did not, for example, contact Dr. Toranto or the numerous physicians who sent letters to Rady Children's refuting Dr. Jaffurs' statements and offering unconditional support to Dr. Toranto's application for admitting privileges.

189.  Defendants CHOC and CHOC Medical Staff are each liable to plaintiff for the tort of libel committed by Dr. Jaffurs under the theory of agency.

190.  Defendant Rady Foundation is liable to plaintiff for the tort of libel committed by its employee, Dr. Gosman, on the basis of *respondeat superior*.

191.  Defendants Rady Children's and Rady Children's Medical Staff are liable to plaintiff for the tort of libel committed by Dr. Gosman, under the theory of agency.

192.  The defamatory (slanderous and libelous) statements made, forwarded, conveyed, or repeated by defendants have caused, are causing, and will continue to cause Dr. Toranto to suffer extensive harm to his reputation and goodwill and damages.  The defamatory statements prevented Dr. Toranto from obtaining employment at the CHOC Foundation, employment at the Rady Foundation or

1   UCSD, prevented Dr. Toranto from obtaining privileges at Rady Children's for over

2   two years, and have prevented Dr. Toranto from obtaining employment and work as

3   a pediatric craniofacial plastic surgeon in this district.

4       193.  Defendants acted with malice, oppression, and/or fraud in making and

5   disseminating the defamatory statements about Dr. Toranto, entitling Dr. Toranto to

6   punitive damages.

**Seventh Claim for Relief**

**(Cal. Labor Code § 1050 et seq.)**

**(Against Defendants Dr. Jaffurs, Dr. Gosman, CHOC & CHOC Medical Staff)**

11      194.  Plaintiff hereby incorporates the paragraphs above, each as though fully set

12  forth herein.

13      195.  Dr. Jaffurs, acting in his professional capacity as a member of the UCI

14  medical staff, made false statements and misrepresentations about Dr. Toranto to

15  the CHOC Foundation and the Rady Defendants, all of whom understood the

16  statements to be about Dr. Toranto.

17      196.  Dr. Gosman, acting in her professional capacity as an employee of UCSD,

18  made false statements and misrepresentations about Dr. Toranto to Rady Children's,

19  Rady Foundation, and Rady Medical Staff, all of whom understood the statements to

20  be about Dr. Toranto.

21      197.  Dr. Jaffurs, acting in his professional capacity as the chief of plastic surgery

22  for CHOC, made false statements and misrepresentations about Dr. Toranto to the

23  CHOC Foundation, Rady Children's, Rady Children's Medical Staff, Rady

24  Foundation, UCSD, and Dr. Gosman, all of whom understood the statements to be

25  about Dr. Toranto.

26      198.  Dr. Jaffurs, acting in his professional capacity as the chief of plastic surgery

27  for the CHOC Medical Staff, made false statements and misrepresentations about

28  Dr. Toranto to the CHOC Foundation, Rady, Rady Children's Medical Staff, Rady

1   Foundation, UCSD, and Dr. Gosman, all of whom understood the statements to be

2   about Dr. Toranto.

3   199.  The statements by Drs. Jaffurs and Gosman were made after Dr. Toranto

4   tendered his resignation at UCI.

5   200.  Dr. Jaffurs' statements were made to prevent or attempt to prevent Dr.

6   Toranto from (i) obtaining employment at the CHOC Foundation, (ii) obtaining

7   employment at the Rady Foundation and UCSD, and (iii) obtaining employment or

8   work as a pediatric craniofacial plastic surgeon anywhere in San Diego by preventing

9   Dr. Toranto from obtaining privileges at Rady Children's.  Such statements were

10   made after Dr. Toranto tendered his resignation at UCI.  On account of such

11   statements, Dr. Toranto was denied employment at the CHOC Foundation, was

12   denied employment at the Rady Foundation and UCSD, and has been prevented for

13   over two years from obtaining employment or work as a pediatric craniofacial plastic

14   surgeon anywhere in San Diego.

15   201.  Dr. Gosman's statements were made to prevent or attempt to prevent Dr.

16   Toranto from (i) obtaining employment at the Rady Foundation, and (ii) obtaining

17   employment or work as a pediatric craniofacial plastic surgeon anywhere in San

18   Diego by preventing Dr. Toranto from obtaining privileges at Rady Children's.  Such

19   statements were made after Dr. Toranto tendered his resignation at UCI.  On

20   account of such statements, Dr. Toranto was denied employment at the Rady

21   Foundation, and has been prevented from obtaining employment or work as a

22   pediatric craniofacial plastic surgeon anywhere in San Diego.

23   202.  CHOC and CHOC Medical Staff are liable under California Labor Code

24   sections 1052 and 1054 for knowingly permitting its employee, Dr. Jaffurs, to take

25   the above-described actions and not taking appropriate action, and/or for failing to

26   take all reasonable steps within its power to prevent Dr. Jaffurs from making the

27   false and defamatory statements that caused Dr. Toranto harm.

28

203.  Defendants CHOC and CHOC Medical Staff are liable under principles of agency for the acts of its agent Dr. Jaffurs.

204.  Dr. Toranto has suffered, is suffering, and will continue to suffer, harm, as he has been prevented from obtaining employment at the CHOC Foundation, obtaining employment at the Rady Foundation and UCSD, obtaining privileges at Rady Children's, or obtaining employment or work as a pediatric craniofacial plastic surgeon anywhere in San Diego by preventing Dr. Toranto from obtaining privileges at Rady Children's.

205.  Dr. Toranto is entitled to recover threefold the damages he has sustained.

## Eighth Claim for Relief

## (Tortious Interference with Prospective Economic Relations)

## (Against All Defendants)

206.  Plaintiff hereby incorporates the paragraphs above, each as though fully set forth herein.

### *Economic Relations with the CHOC Foundation*

207.  While Dr. Toranto was employed at UCI and working at UCI/CHOC, Dr. Toranto was in a relationship with the CHOC Foundation, an entity closely affiliated with CHOC, which employed many of the physicians who had admitting privileges at CHOC, including a large number of Dr. Toranto's friends and colleagues.  The relationship would have resulted in economic benefit to Dr. Toranto, as he would have been able to continue to practice his medical specialty at CHOC and UCI, for which he would have been compensated.

208.  In 2015, Dr. Toranto entered into employment discussions with the CHOC Foundation, where he would have been able to continue his medical practice at UCI/CHOC.

209.  Dr. Jaffurs knew of the relationship Dr. Toranto had with CHOC and the CHOC Foundation, and knew that Dr. Toranto was seeking employment with the CHOC Foundation.

210.  Dr. Jaffurs intended to disrupt the relationship between Dr. Toranto and CHOC, and between Dr. Toranto and the CHOC Foundation.

211.  Dr. Jaffurs engaged in wrongful conduct by making false and defamatory statements to the CHOC Foundation about Dr. Toranto, as described above.

212.  Dr. Jaffurs disrupted Dr. Toranto's relationship with the CHOC Foundation, as the CHOC Foundation ultimately did not hire Dr. Toranto.

213.  Dr. Toranto was harmed, as he was unable to continue his medical practice at UCI/CHOC outside the administrative purview of Dr. Jaffurs, and ultimately took a leave of absence from CHOC to get away from Dr. Jaffurs.

214.  Dr. Jaffurs' defamatory statements were a substantial factor in causing the CHOC Foundation to not hire Dr. Toranto.

215.  Defendants CHOC and CHOC Medical Staff are liable to plaintiff for the tort committed by Dr. Jaffurs, under the theory of agency.

*Economic Relations with Rady Children's*

216.  In late 2015, Dr. Toranto applied for admitting privileges at Rady Children's.  This relationship was likely to have resulted in economic benefit to Dr. Toranto, absent wrongful interference.  Dr. Toranto would have been able to continue to practice his medical specialty at Rady Children's, for which he would have been compensated.  The likelihood that Dr. Toranto would gain admitting privileges at Rady Children's is evidenced by positive feedback that he received from individuals at CHOC and UCI, unqualified letters of support provided by colleagues in support of his application to Rady Children's, his blemish-free professional record, and the fact that he had been credentialed at each and all of the numerous hospitals to which he had ever applied without incident or delay.

217.  Dr. Jaffurs and Dr. Gosman knew of the relationship between Dr. Toranto and Rady Children's, becoming aware soon after Dr. Toranto tendered his resignation at UCI that Dr. Toranto was applying for admitting privileges at Rady Children's.

218.  Dr. Jaffurs and Dr. Gosman intended to disrupt the relationship, and sought to have Rady Children's deny Dr. Toranto admitting privileges.

219.  Dr. Jaffurs engaged in wrongful conduct by making false and defamatory statements about Dr. Toranto to Rady Children's.

220.  Dr. Gosman engaged in wrongful conduct by disseminating and perpetuating Dr. Jaffurs' false and defamatory statements about Dr. Toranto to Rady Children's, Rady Children's Medical Staff, the Rady Foundation and UCSD.

221.  Rady Children's indicated to Dr. Toranto that Dr. Toranto's privileges would be presumptively denied, though there was never any objective basis for Rady's determination.  Thus, the relationship between Dr. Toranto and Rady Children's was disrupted.

222.  Dr. Toranto has been harmed, as he has been unable to practice pediatric craniofacial plastic surgery in San Diego or Imperial Counties for well over two years.

223.  Dr. Jaffurs' and Dr. Gosman's false and defamatory statements are the primary and substantial factor in causing the harm suffered by Dr. Toranto as a result of Rady Children's unwillingness to give procedurally fair consideration to his application for privileges.

224.  Defendants CHOC and CHOC Medical Staff are liable to plaintiff for the tort committed by Dr. Jaffurs, under the theory of agency.

225.  Defendant Rady Foundation is liable to plaintiff for the tort committed by its employee, Dr. Gosman, under the theory of *respondeat superior*.

226.  Defendants Rady Children's and Rady Children's Medical Staff are liable to plaintiff for the tort committed by Dr. Gosman, under the theory of agency.

### *Economic Relations with CHOC*

227.  As set forth above, Dr. Toranto was employed at UCI and working at UCI/CHOC, Dr. Toranto was in a relationship with CHOC.  The relationship would have resulted in economic benefit to Dr. Toranto, as he would have been able

to continue to practice his medical specialty at CHOC, for which he would have been compensated.

228.  Dr. Jaffurs intended to disrupt and did disrupt Dr. Toranto's relationship with CHOC as set forth above, specifically paragraphs 60 to 76 and 115 to 122, including by engaging in wrongful conduct by making false and defamatory statements to CHOC about Dr. Toranto, and coercing other CHOC physicians into declining to provide call coverage for Dr. Toranto or work with Dr. Toranto.

229.  Dr. Toranto has been harmed by Dr. Jaffurs' disruption of Dr. Toranto's relationship with CHOC, as his ability practice at CHOC has been impeded.

### Ninth Claim for Relief

### (Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq.)

### (Against all Defendants)

230.  Dr. Toranto hereby incorporates the paragraphs above, each as though fully set forth herein.

231.  Defendants have engaged in the following unlawful, unfair, and/or fraudulent acts, in violation of Cal. Bus. & Prof. Code § 17200 et seq.:

   a.  The actions by defendants Dr. Gosman, Rady Defendants, and Dr. Jaffurs constitute a violation of 15 U.S.C. § 1, as alleged in the First Claim for Relief, which allegations are incorporated as though fully set forth herein.

   b.  The actions by defendants Dr. Gosman, Rady Defendants, and Dr. Jaffurs constitute a violation of 15 U.S.C. § 2, as alleged in the Second Claim for Relief, which allegations are incorporated as though fully set forth herein.

   c.  The actions by defendants Dr. Gosman and Rady Defendants constitute bad faith professional review, in violation of Cal. Bus. & Prof. Code § 809.05 et seq., as alleged in the Third Claim for Relief, which allegations are incorporated as though fully set forth herein.

Second Amended Complaint
*Toranto v. Jaffurs, et al.*

d. The actions by defendants Dr. Jaffurs, and CHOC constitute illegal retaliation, in violation of Cal. Bus. & Prof. Code §§ 510-512, 2056, as alleged in the Fourth Claim for Relief, which allegations are incorporated as though fully set forth herein.

e. The actions by defendants Dr. Jaffurs and CHOC constitute illegal retaliation, in violation of Cal. Labor Code § 1102.5, as alleged in the Fifth Claim for Relief, which allegations are incorporated as though fully set forth herein.

f. The false and defamatory statements made by Dr. Jaffurs and perpetuated or repeated by his co-defendants constitutes illegal defamation in violation of Cal. Civ. Code §§ 45-46, as alleged in the Sixth Claim for Relief, which allegations are incorporated as though fully set forth herein.

g. The actions by defendants Dr. Jaffurs, Dr. Gosman, CHOC, and CHOC Medical Staff in attempting to prevent Dr. Toranto from obtaining employment after he tendered his resignation from UCI constitute violations of Cal. Labor Code § 1050 et seq. as alleged in the Seventh Claim for Relief, which allegations are incorporated as though fully set forth herein.

h. The actions by all defendants constitute tortious interference with prospective economic relations as alleged in the Eighth Claim for Relief, which allegations are incorporated as though fully set forth herein.

232. The above-described unlawful, unfair, and/or fraudulent actions by defendants have harmed Dr. Toranto by preventing Dr. Toranto from: (i) obtaining employment in Orange County with the CHOC Foundation; (ii) obtaining employment in San Diego with the Rady Foundation and UCSD; (iii) obtaining privileges at Rady Children's; (iv) receiving procedurally fair consideration of his

1  application for privileges at Rady Children's; and (v) having access to the market in

2  San Diego and Imperial County for his services as a pediatric craniofacial plastic

3  surgeon.

4      233.  Dr. Toranto is entitled to injunctive relief, restraining defendants from

5  engaging in further defamatory, retaliatory, and anti-competitive conduct.

6                          **Prayer for Relief**

7      Based on the allegations above, Plaintiff Jason Toranto seeks judgment

8  against defendants as follows:

9      a. That defendants be restrained from engaging in further defamatory,

10         retaliatory, and anti-competitive conduct in accordance with applicable

11         law and the Rady Children's Medical Staff Bylaws;

12     b. That Rady Children's and Rady Medical Staff be required to take

13        affirmative acts to be determined by the Court to ensure and compel

14        the restoration of competition hindered by their anti-competitive

15        conduct, which acts may include, without limitation, submitting to the

16        Court's oversight and monitoring to ensure pediatric plastic and

17        craniofacial procedures are reasonably distributed to physicians not

18        employed by the Rady Foundation;

19     c. That plaintiff recover from defendants, jointly and severally, threefold

20        his damages suffered by reason of the federal antitrust law violations

21        and violation of Cal. Labor Code § 1050 et seq.;

22     d. That plaintiff recover from defendants, jointly and severally, his general

23        and special damages according to proof and trial;

24     e. That plaintiff recover from defendants, jointly and severally, punitive

25        and exemplary damages for retaliation and defamation;

26     f. For attorneys' fees and costs; and

27     g. For such other relief as the Court may deem just and proper.

28

*Second Amended Complaint*
*Toranto v. Jaffurs, et al.*

1  Dated:  July 25, 2018                    FITZGERALD KNAIER LLP

2

3                                    By: /s/ Kenneth M. Fitzgerald
                                         Kenneth M. Fitzgerald, Esq.
4                                        Robert G. Knaier, Esq.
                                         Howard C. Wu, Esq.
5                                        Attorneys for Plaintiff
                                         Jason Toranto
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second Amended Complaint
                                      *Toranto v. Jaffurs, et al.*

## Jury Demand

Plaintiff Jason Toranto hereby demands a trial by jury for all issues so triable.

DATED:   July 25, 2018                    FITZGERALD KNAIER LLP


                                    By: *s/ Kenneth M. Fitzgerald*
                                        Kenneth M. Fitzgerald, Esq.
                                        Robert G. Knaier, Esq.
                                        Howard C. Wu, Esq.
                                        Attorneys for Plaintiff
                                        Jason Toranto